No. 04-851

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 64

ANITA BIG SPRING,

        Contestant and Appellant,

   v.

RICK JORE,

        Contestee and Respondent.

APPEAL FROM:    District Court of the Twentieth Judicial District,
                      In and for the County of Lake, Cause No. DV 04-258
                      The Honorable Deborah Kim Christopher, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                Peter M. Meloy & Jennifer Hendricks, Meloy Trieweiler, Helena, Montana

        For Respondent:

                Duncan Scott, Scott & Kalvig, Kalispell, Montana

                                Submitted on Briefs:  December 28, 2004

                                        Decided:  March 18, 2005

Filed:

                             _____
                                         Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Anita Big Spring appeals a decision of the District Court for the Twentieth Judicial District, Lake County, finding that seven contested ballots in the race for House District 12 are valid. We reverse and remand for further proceedings consistent with this Opinion.

¶2 We address the following issue on appeal: Whether the District Court erred in counting seven overvoted ballots as votes for Contestee-Appellee Rick Jore.

**Factual and Procedural Background**

¶3 On November 2, 2004, Lake County held an election to select a representative for House District 12. The candidates listed by name on the ballot were Jeanne Windham, the nominee of the Democratic Party; Rick Jore, the nominee of the Constitution Party; and Jack Cross, the nominee of the Republican Party. Anita Big Spring is an elector entitled to vote in the election for House District 12, a responsibility which she duly exercised.

¶4 Lake County used an AIS 315 scanning machine to count the number of votes cast for each candidate. This machine is designed so that it will not count ballots in which the voter has made a mark in more than one designated voting area for the same contest. Any ballot on which there is more than one mark for the same contest is rejected by the machine as an "overvote." That ballot is then examined separately by an election official.

¶5 With respect to the votes cast for the three candidates for House District 12, seven ballots had marks in the designated area for more than one candidate. On five of the seven ballots, the ovals for both Jore and Cross were filled in, however, the oval for Cross was also marked with an X. On the sixth ballot, both the ovals for Jore and Cross were filled in, but

2

the area next to Cross's name was also marked with a squiggly line. On the seventh ballot, both the ovals for Jore and Cross were filled in, but the area next to Cross's name was marked with an additional line extending towards and under his name and with what appear to be the letters "NRA" or "NLA" written in. These seven ballots were read as "overvotes" and rejected by the AIS 315 scanning machine.

¶6 An election official examined these seven ballots after they were rejected by the scanning machine. That official then affixed a white label over each mark for Cross and fed the ballots back through the machine with the result that the votes were counted for Jore. At the conclusion of the initial count, Jore was determined to be the winner by only two votes, hence, Windham requested a recount. During the course of this recount, Windham became aware of the seven ballots at issue here. At the conclusion of the recount, which included the seven previously mentioned ballots, the Recount Board determined that the election was a tie between Windham and Jore.

¶7 Windham filed suit in the First Judicial District Court (*Jeanne Windham v. Judy Martz and Bob Brown*, Cause No. ADV 04-896). On November 30, 2004, the District Court entered an *ex parte* temporary restraining order enjoining the defendants from certifying the election results of House District 12 or appointing a candidate. At a hearing on December 9, 2004, the court denied Windham's request for relief and allowed the temporary restraining order to expire on its own terms the following day.

¶8 On December 6, 2004, Windham filed an Application for Writ of Mandamus or Declaratory Relief with this Court asking that we assume original jurisdiction over this

3

matter. We denied the application on December 9, 2004, holding that a writ of mandamus was not the correct remedy in this matter. The following day, Big Spring filed a petition in the Twentieth Judicial District Court to contest the certification of the race for House District 12 as a tie. That court ordered that Big Spring's petition be held in abeyance until such time as the election was certified and Governor Martz nominated an individual to fill the seat in House District 12.

¶9     The State Board of Canvassers certified the election as a tie on December 13, 2004, and, pursuant to § 13-16-503, MCA, the Secretary of State certified the result to Governor Martz. On December 15, 2004, Governor Martz appointed Jore to represent House District 12.

¶10     With the election results certified and an individual appointed by the Governor to fill the seat, the District Court held a hearing on Big Spring's petition on December 17, 2004, at which time evidence was received and arguments presented. That same afternoon, the District Court issued its decision in favor of Jore. The court determined that all seven of the contested ballots were valid and that those electors intended to vote for Jore. In making this determination, the court stated that this Court's precedents prohibiting speculation about voter intent did not apply in this case. Big Spring appeals the District Court's December 17, 2004 Findings of Fact, Conclusions of Law and Order.

**Standard of Review**

¶11     Jore asks this Court to defer to the discretion of the District Court in this case in light of the recent developments in election law and the resulting wholesale changes made to

4

Montana's election code.  To support this proposition, Jore cites to a West Virginia case in which the Supreme Court of Appeals of  West Virginia deferred to local election officials in their determination of voter intent.  In *State ex rel. Bowling v. Greenbrier County Comm'n* (W.Va. 2002), 575 S.E.2d 257, 259, the Court of Appeals stated that

> in the absence of evidence of patent error or of fraud, courts should be cautious about "monkeying" with reasoned determinations of designated election officials--particularly when judicial intervention would result in the disenfranchising of voters.

Ironically, two of the contested ballots in *Bowling* had the ovals for two candidates filled in and a handwritten X placed over one of the ovals just as in the case *sub judice*.  The court in *Bowling* agreed with the County Commission in that case that the voter's intent for these two ballots could not be clearly ascertained.  *Bowling*, 575 S.E.2d at 262.  Accordingly, *Bowling* supports Big Spring's argument, not Jore's.

¶12	We are not persuaded by Jore's argument as nothing in the 2003 changes to Montana's election codes statutorily overruled this Court's precedents.  Moreover, the West Virginia statutes relied on in *Bowling*, are different from Montana's.  West Virginia's statutes spell out that the "trial court" in an election contest is the County Commission, while the courts serve in an appellate role.  *Bowling*, 575 S.E.2d at 259.  The West Virginia courts have concluded that this scheme requires them to defer to factual findings, a view directly at odds with this Court's holding in *Rennie v. Nistler* (1987), 226 Mont. 412, 735 P.2d 1124.

5

¶13 In *Rennie*, the validity of one contested ballot determined the outcome of the election for County Attorney of Lake County. We pointed out in that similar situation that we were "free to make our own examination of the entire case, and to make a determination in accordance with our findings." *Rennie*, 226 Mont. at 415, 735 P.2d at 1126 (citing *Steadman v. Halland* (1982), 197 Mont. 45, 51, 641 P.2d 448, 452; *Reid v. Park County* (1981), 192 Mont. 231, 237, 627 P.2d 1210, 1214). The Respondent in *Rennie* had argued that this Court is bound to accept the findings of the District Court as a matter of discretion unless that discretion was abused and that to rule otherwise would "put the Supreme Court in the election booth." *Rennie*, 226 Mont. at 415, 735 P.2d at 1126. We stated then that

> we are required [by § 3-2-204(5), MCA] in equity cases to review all questions of fact arising upon the evidence presented in the record, . . . and to determine the same as well as questions of law. . . . We are not, thereby, "putting ourselves in the election booth" anymore than did the District Court in making its determination.

*Rennie*, 226 Mont. at 415, 735 P.2d at 1126.

¶14 Moreover, as the United States Supreme Court recently stated in *Bush v. Gore* (2000), 531 U.S. 98, 111, 121 S.Ct. 525, 533, 148 L.Ed.2d 388: "When contending parties invoke the process of the courts . . . , it becomes our unsought responsibility to resolve the federal and constitutional issues the judicial system has been forced to confront." We have no less unsought responsibility when contending parties invoke the process of our judicial system in an election contest we are forced to confront.

6

¶15    Consequently, our standard of review in questions of this nature will continue to be *de novo*. In other words, we will apply the same standard that should have been applied by the District Court--plenary review of the validity of the challenged ballots.

**Discussion**

¶16    *Whether the District Court erred in counting seven overvoted ballots as votes for Contestee-Appellee Rick Jore.*

¶17    Big Spring argues on appeal that because the elector's choice cannot be clearly determined from the face of the seven ballots at issue here, those seven ballots are invalid and the District Court erred in counting those seven votes for Jore. Jore argues, on the other hand, that treating those seven ballots differently than 73 other substantially identical ballots in other races would violate the equal protection guarantees of the Fourteenth Amendment to the United States Constitution and Article II, Section 4 of the Montana Constitution. Jore also argues that it would violate § 13-15-206, MCA, which requires that votes be counted "in a uniform manner."

¶18    Many of the statutes and regulations that govern the counting of ballots in Montana were only recently enacted in response to the problems that arose during the 2000 Presidential election and the United States Supreme Court's subsequent decision in *Bush* wherein the Supreme Court stated:

> The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another. *See, e.g., Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 665, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) ("[O]nce the franchise is granted to the

7

electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment"). It must be remembered that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

*Bush*, 531 U.S. at 104-05, 121 S.Ct. at 530.

¶19    In *Bush*, the Supreme Court concluded that the recount process ordered by the Florida court did not provide for uniform standards or guidelines on how a vote was to be counted, thus the Supreme Court held that the process used for determining voter intent did not satisfactorily guarantee that voters received equal protection under the law. To that end the Supreme Court stated in *Bush*:

> The recount mechanisms implemented in response to the decisions of the Florida Supreme Court do not satisfy the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right. Florida's basic command for the count of legally cast votes is to consider the "intent of the voter." This is unobjectionable as an abstract proposition and a starting principle. The problem inheres in the absence of specific standards to ensure its equal application. The formulation of uniform rules to determine intent based on these recurring circumstances is practicable and, we conclude, necessary.

*Bush*, 531 U.S. at 105-06, 121 S.Ct. at 530 (internal citation omitted).

¶20    In response to the Supreme Court's decision in *Bush*, the 2001 Montana Legislature passed House Joint Resolution (HJR) 8 establishing an interim committee to study Montana's election laws, including any "problems associated with recounts and resolution of voter intent with respect to disputed ballots." HJR 8, ¶ 6(b). In 2002, the interim committee reported its findings to the Montana Legislature recommending the following

8

changes, among others, in Montana's vote-counting procedures:  (1) require that if an automated system rejects a ballot or records an undervote or overvote on the ballot, the ballot must be set aside and manually evaluated so that it can either be processed by the system or manually counted; (2) direct the Secretary of State to adopt uniform rules on what constitutes a valid vote for each type of ballot used in the State; and (3) provide that when manually counting votes, a vote is valid if the voter's intent can be clearly determined as agreed upon by a majority of election judges applying uniform rules adopted by the Secretary of State. Sheri S. Heffelfinger, *Equal Protection of Your Vote*, A Report to the 58th Legislature by the State Administration and Veteran's Affairs Interim Committee 10 (November 2002) (hereinafter *Heffelfinger*).

¶21    These recommendations were incorporated into House Bill (HB) 155, which the 2003 Legislature passed into law and which took effect on October 1, 2003.  In the preamble to HB 155, the Legislature stated that

> this legislation will . . . require the Secretary of State to adopt *uniform statewide rules* regarding ballot form, votes and vote counts, and other operational procedures specific to each voting system . . . ; and *require all counting boards to use the uniform counting procedures specified.* [Emphasis added.]

¶22    Prior to the Supreme Court's decision in *Bush*, both statutory and case law in Montana " required that ballots be disallowed unless the intent of electors could be established with *reasonable certainty* from the ballot."  *Paulsen v. Huestis*, 2000 MT 280, ¶ 17, 302 Mont. 157, ¶ 17, 13 P.3d 931, ¶ 17 (citing *Marsh v. Overland* (1995), 274 Mont. 21, 905 P.2d 1088) (emphasis added).  We stated in *Spaeth v. Kendall* (1990), 245 Mont.

9

352, 354, 801 P.2d 591, 593, that this Court "has consistently rejected ballots or portions of ballots where the intention of the voter does not plainly appear." *See also Rennie*, 226 Mont. at 417, 735 P.2d at 1127; *Peterson v. Billings* (1939), 109 Mont. 390, 393, 96 P.2d 922, 923. Hence, this Court has insisted that the voter's intent be clear without any speculation and we rejected the "substantial compliance" test used in some states in favor of a strictly objective standard. *Marsh*, 274 Mont. at 26-27, 905 P.2d at 1091-92. We summarized the rationale underlying our consistent rejection of ballots where the voter's intent is not clear in *Spaeth* wherein we stated that

> "the paramount and ultimate object of all election laws under our system of government is to obtain an honest and fair expression from the voters upon all questions submitted to them." When such expression cannot be gleaned without speculation, however, the vote is to be voided, to insure a standard of objectivity in our election process.

*Spaeth*, 245 Mont. at 354-55, 801 P.2d at 593 (quoting *Dickerman v. Gelsthorpe* (1897), 19 Mont. 249, 255, 47 P. 999, 1001).

¶23    Montana's previous statutory test for determining whether to count a ballot had provided, in pertinent part, as follows:

> A ballot or part of a ballot is void and may not be counted if the elector's choice cannot be determined. *If part of a ballot is sufficiently plain to determine the elector's intention*, the election judges shall count that part.

Section 13-15-202(3), MCA (Repealed 2003) (emphasis added). But, after *Bush*, the 2003 Legislature enacted a stricter test for determining whether to count a ballot:

> Each questionable vote on a paper ballot set aside under subsection (2)(a) or (3)(b) must be counted *if the voter's intent can be clearly determined*

10

and agreed upon by a majority of the election judges on the counting board in accordance with the rules adopted pursuant to subsection (7).

Section 13-15-206(4)(a), MCA (2003) (emphasis added). The 2003 Legislature also provided that "[a] vote is not valid and may not be counted if the elector's choice cannot be determined as provided in this section." Section 13-15-206(6), MCA (2003).

¶24 Section 13-15-206(7), MCA (2003), granted the Secretary of State the authority to adopt rules defining a valid vote for each type of ballot and for each type of voting system used in the State. To that end the Secretary of State adopted the following Rule:

44.3.2402. DETERMINING A VALID VOTE IN MANUALLY COUNTING AND RECOUNTING PAPER AND OPTI-SCAN BALLOTS
    (1) The following general rules shall apply in a count or recount of paper and opti-scan ballots:
    (a) two (or more) designated voting areas have been marked and one (or more) mark has been erased, but residue is left. The election official shall clarify the ballot and cause a vote to be counted for the designated voting area that has been marked;
    (b) one designated voting area is marked and a second designated voting area is marked with a heavy mark and no erasure has been attempted. The election official shall cause this to be counted as an overvote;
    (c) the designated voting area has been marked for one response and a partially completed mark is made in a designated voting area. The mark may or may not have some erasure although for the purpose of this rule erasure is not required. The election official shall cause this to be counted as an overvote;
    (d) the designated voting area has been marked for one response and a hesitation mark is present within other designated voting area. The election official shall clarify the ballot and cause a vote to be counted for the designated voting area that has been marked;
    (e) the designated voting area has not been marked according to instructions but the response is circled. The election official shall clarify the ballot by marking the designated voting area beside the circled vote if the marking of the designated voting area is consistent throughout the individual's ballot, and cause a vote to be counted for the marked designated voting area;

11

(f) the designated voting area has not been marked according to instructions but there is a connective line or arrow between the response and the designated voting area to indicate the vote. The election official shall clarify the ballot if the connective line or arrow beside the designated voting area is consistent throughout the individual's ballot, and cause a vote to be counted for the marked designated voting area;

(g) more than one designated voting area has been marked, but no clear mark is used to indicate the correct vote. The election official shall cause this to be counted as an overvote;

(h) more than one designated voting area has been marked, but a clear word, mark or statement is used to indicate the correct vote. The election official shall clarify the ballot and cause a vote to be counted for the designated voting area indicated as the correct vote;

(i) a word or statement has been used to indicate the correct vote instead of marking the designated voting area. The election official shall clarify the ballot and cause a vote to be counted for the designated voting area indicated as the correct vote;

(j) all of the designated voting areas are crossed out. The election official shall clarify the ballot and cause this to be counted as an undervote.

¶25 Unfortunately, this Rule does not describe how to treat a double-marked ballot containing an X in one of the voting areas. Even so, Lake County officials disregarded the rules for dealing with overvoted ballots. Subsection (b) of Rule 44.3.2402, ARM, requires that if two designated voting areas in the same race are marked and no erasure is attempted, the ballot must be counted as an overvote. And, subsection (g) of the Rule requires that if no clear mark is used to indicate the correct vote, the ballot must be counted as an overvote. Furthermore, in counties using the AIS-315 scanning device, like Lake County, the Resolution Board is authorized to place an adhesive white label over a mark on a ballot only if the mark is clearly unintentional:

(b) Overvoted ballots.
(i) Ballots that are rejected by the AIS-315 for containing overvotes, shall be inspected by the Resolution Board.

12

(ii) if any smudge, tear, or mark of some kind is able to be identified as clearly an unintentional mark made by the voter, but had the effect of registering too many votes for an office, the Resolution Board may place an adhesive sticker (Avery-0-806 Removable Labels) *over the unintentional mark*.

Rule 44.3.1771(3)(b), ARM (emphasis added). In this case, the Resolution Board improperly placed white stickers over the marks for Cross on the disputed ballots even though the marks were clearly intentional. That does not, however, mean that the marks on Cross's oval should have been interpreted as marks *for* Jore and *against* Cross. Indeed, one can only speculate whether the intentional X was placed on Cross's oval to signify that the elector was voting against Cross or to emphasize the elector's vote for Cross.

¶26 In addition to the seven ballots at issue here, 73 other ballots were offered and admitted as exhibits at the hearing in this matter. None of these 73 ballots were cast in the race for House District 12. However, 41 of these additional ballots had markings similar to the markings on five of the disputed ballots--two ovals darkened in the same race, with a mark like an X over one of the ovals. Two of these 41 ballots were disqualified as overvotes, while the remainder were counted, illustrating an inconsistency within the counting procedure in Lake County. Thirty-one additional ballots were double-voted and had other kinds of extraneous markings such as scribbles or words like "yes" or "no." Each of these ballots were counted according to what election officials discerned to be the voter's intent.

¶27 The last of the 73 additional ballots had multiple markings in the area for Constitutional Initiative 96 (CI-96). The oval to vote "FOR" the initiative is filled in and

marked with an X. The oval to vote "AGAINST" CI-96 is obscured by heavy markings covering the entire area and include the word "not." On cross-examination at the hearing in this matter, the chair of the Lake County Recount Board testified that this ballot could not be counted because determining the voter's intent would require speculation.

¶28 Contrary to the District Court's and Jore's contention that the seven ballots at issue here had to be treated equally to the other 73 ballots in Lake County, Montana's statutes provide that the ballots be treated equally "among jurisdictions using similar ballot types and voting systems." Section 13-15-206(7), MCA. In other words, uniformity must be on a statewide basis, not just how ballots are treated within a particular locale. The Supreme Court concluded in *Bush* that allowing county officials to exercise their individual discretion in interpreting ballots violated the Equal Protection Clause of the United States Constitution. Moreover, the overriding goal of the 2003 amendments to Montana's election code was statewide uniformity. Nothing in the 2003 amendments suggests a desire on the part of the Legislature to give increased discretion to local election officials.

¶29 Jore argues that this Court may not review the seven disputed ballots because the other 73 ballots are not under review. However, none of the other 73 ballots were contested; no one has brought any type of action regarding those 73 ballots. Section 13-36-101, MCA, provides the grounds for contesting a nomination or election to a public office:

> **Grounds for contest of nomination or election to public office**. *An elector may contest the right of any person to any nomination or election to public office* for which the elector has the right to vote, for any of the following causes:
> . . . .

14

(3) on account of illegal votes or an erroneous or fraudulent count or canvass of votes. [Emphasis added.]

Big Spring's challenge is to the House District 12 race and only the seven disputed ballots in that race are at issue. The other 73 ballots have nothing to do with that race.

¶30 In her challenge of the race for House District 12, Big Spring argues that because the elector's choice cannot be clearly determined from the face of the seven ballots at issue, those seven ballots are invalid and the District Court erred in counting those seven votes for Jore. On five of those seven ballots, the ovals for both Jore and Cross were filled in, however, the oval for Cross was also marked with an X.

¶31 Marking an X on a ballot has a long and consistent history in Montana as the method a voter uses to make his or her vote for a candidate. Marking an X was even required by law until 2003. *See* § 13-12-209, MCA (Repealed 2003). The 2002 interim report recommending changes to Montana's election code highlighted the ambiguity of an X marking a spot on a ballot:

> No matter the technology used, the HJR 8 Subcommittee on Voting Systems is finding that subjectivity and human error cannot be removed from the vote counting process because we voters are, after all, only human. We make mistakes. Sometimes these mistakes are our own fault. Sometimes our mistakes are caused by faulty or difficult to use equipment.
>
> For example, you may have marked a ballot with an "X" when you should have darkened in the oval. In a manual count, the human counter would have to determine whether you marked an "X" because you intended to vote for that candidate or because you did not want to vote for that candidate. Furthermore, in one county, the counters may have been instructed to interpret an "X" as a vote, while in another county, the counters may have been instructed to interpret an "X" as a nonvote.

15

*Heffelfinger*, at 16-17.

¶32    To further compound the problem, in the course of his campaign for House District 12, Cross placed radio advertisements which included the statement, "Cross out the competition and vote for the Cross that matters." These advertisements ran 18 times in the last few days before the election. Thus the question remains: Was the X placed there to signify that the elector was voting against Cross or to emphasize the elector's vote for Cross?

¶33    As we stated in *Rennie*:

> So many questions arise from the contested ballot itself as to the intentions of the voter, and the confusion that results from attempting to find a consistency in his method of voting that it becomes clear that his ballot should be rejected . . . . The voter's intent and choice do not clearly appear.

*Rennie*, 226 Mont. at 417, 735 P.2d at 1127. None of the five ballots containing an X in the oval before Cross's name satisfied the objective standards for clearly determining voter intent on overvoted ballots as specified in § 13-15-206(4)(a), MCA. Hence, we hold that these five ballots should have been declared invalid and not counted pursuant to § 13-15-206(6), MCA. *See* ¶ 23 of this Opinion.

¶34    We also point out that the District Court erred in this case in concluding that filling in two ovals in the same designated area and then placing an X in one oval does not spoil the ballot. This is contrary to the clear instructions posted for voters at each voting station and § 13-13-117(b), MCA, which provides that "[a]n elector who spoils the elector's ballot must be provided with another ballot in place of the spoiled ballot." The following warning was posted at each voting station in Lake County:

16

Do **NOT** cross out or erase. If you change your mind, please ask the judges for a new ballot. They will instruct you.

Sixty-seven people in Lake County obtained a new ballot as instructed. If the ballots of those voters that did not follow the law are allowed to be counted, then those voters that did follow the law would indeed receive unequal treatment.

¶35 The District Court also erred in concluding that because the vote for Jore and Windham was a tie, the court could not substitute its judgment for the Election Board without having the legal effect of electing Windham, the person for whom none of the voters of the seven contested ballots voted. Rather than determining the narrow legal question of the validity of the seven disputed ballots, the District Court improperly inserted the political consequences of the result into the question. This is not only improper speculation on the part of the court as to the outcome of the race, but it gives those seven disputed ballots greater weight than each of the other 4200 ballots cast in the race for House District 12.

¶36 Accordingly, we hold that because the five ballots containing an X through the oval before Cross's name are invalid, the District Court erred in counting those five ballots for Contestee-Appellee Rick Jore. Having determined that these five ballots are invalid, it is not necessary for us to discuss the validity of the other two disputed ballots. As we noted in our December 28, 2004 Order, "Since the race for House District 12 was declared a tie, it is undisputed that if the District Court erred with regard to any one of the seven ballots, Jeanne Windham will have won election to the Montana House of Representatives."

17

¶37    Both parties ask this Court to award them their reasonable costs and attorney's fees. However, in Montana, litigants generally are not entitled to an award of attorney's fees absent a specific contractual or statutory provision. *Marsh*, 274 Mont. at 30, 905 P.2d at 1093 (citing *Howell v. State* (1994), 263 Mont. 275, 285, 868 P.2d 568, 574). Section 13-36-205, MCA, authorizes an award of attorney's fees to the prevailing party in a contested election proceeding: "In any contest, the prevailing party may recover his costs, disbursements, and reasonable attorney's fees. Costs, disbursements, and attorney's fees in all such cases shall be in the discretion of the court." Because § 13-36-205, MCA, places the award of attorney's fees within the trial court's discretion, our standard of review is whether the court abused its discretion. *Paulsen*, ¶ 35 (citing *Swenson v. Janke* (1995), 274 Mont. 354, 360, 908 P.2d 678, 682).

¶38    The District Court had exercised its discretion in awarding Jore his attorney's fees because that court considered him the prevailing party in this election contest proceeding. However, as our Opinion indicates, the prevailing party is actually Big Spring and the same result must be applied to her. Consequently, we hold that Big Spring is entitled to an award of costs and reasonable attorney's fees both in the court below and on appeal pursuant to our decision in *Marsh* and to § 13-36-205, MCA. *Marsh*, 274 Mont. at 30, 905 P.2d at 1093.

¶39    Finally, Big Spring moved to strike certain attachments to Jore's opening brief on appeal as improper because they were not part of the District Court record. We took that motion under advisement. We now hold that the issue is moot based on the foregoing Opinion.

18

¶40 Having said that, Justice Rice has raised several contentions in his dissent that deserve response. First, he faults the Court for not relying on the West Virginia Supreme Court of Appeals' decision in *Bowling* wherein that court deferred to local election officials in their determination of voter intent. As we pointed out in our Opinion, *Bowling* is distinguishable from the case *sub judice* because the West Virginia statutes relied on in that case are different from Montana's statutes. And, contrary to the dissent's claim that the majority "seized" on the result in *Bowling* rather than addressing the purpose for which Jore cited that case, we merely pointed out that, in actuality, *Bowling* supports Big Spring's argument, not Jore's. Just as in the case before us on appeal, two of the contested ballots in *Bowling* had the ovals for two candidates filled in and a handwritten X placed over one of the ovals. The West Virginia Supreme Court of Appeals agreed with the County Commission in that case that the voter's intent for those two ballots could not be clearly ascertained. *Bowling*, 575 S.E.2d at 262.

¶41 Second, the dissent contends that this Court "simply tosses" the uniform rules formulated by the Legislature to determine voter intent. To the contrary, we simply applied the law and rules that the Legislature and the Secretary of State adopted. Unfortunately, there is nothing in either that describes how one is to garner voter intent from a double-marked ballot containing an X in one of the voting areas--as the *Bowling* court concluded. Moreover, it is questionable, at best, to conclude that local officials were trained as to how to divine voter intent with respect to these ballots in the absence of any rules to guide them. And, it is equally unclear how local officials were trained to deal with the sorts of ballots at

19

issue here so as to ensure that similar ballots were treated uniformly from county to county, as the *Bush* decision requires. In truth, determining voter intent from ballots as mismarked as the ones at issue here turns the process of interpretation into little more than a guessing game.

¶42 Third, the dissent complains that our *de novo* review of the challenged ballots is based on "the personal reactions or opinions of individual justices." As pointed out in the Opinion, it is quite clear that Montana law requires *de novo* review. While the dissent may prefer West Virginia's approach and the *Bowling* court's decision, our duty is to interpret and apply Montana law as enacted, which, as previously noted, is decidedly different than West Virginia law.

¶43 Fourth, the dissent claims that "it is simply arrogant" for this Court to rely on its prior decisions because our case law was decided prior to the development of the new voting process and those cases "are no longer the law." However, a clear reading of those cases indicates that they are even more relevant in light of the 2003 amendments to Montana's election laws. In those prior decisions, this Court consistently rejected ballots or portions of ballots where the intention of the voter did not plainly appear; we insisted that the voter's intent be clear without any speculation. In effect, the 2003 Legislature codified our prior case law when it amended Montana's election laws to provide that a vote is not valid and may not be counted if the elector's choice cannot be "clearly determined." Section 13-15-206, MCA (2003).

¶44 Finally, the dissent claims "that on all seven contested ballots, there is a clear, complete, accurately marked, *unencumbered by any other mark*, unmistakable vote in favor of Rick Jore." If that were the case, the AIS 315 scanning machine would not have rejected the ballot in the first place. It is precisely because the ballot was encumbered by another mark, a mark in the oval before another candidate's name, that the scanning machine rejected the ballot as an overvote leaving election officials to speculate on the voter's intent.

¶45 Reversed and remanded for determination of the amount of attorney's fees and costs to be awarded.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY

21

/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA O. COTTER

Justice Jim Rice dissenting.

¶46    I dissent.

¶47    I begin by pointing out that the Court has left the election process unresolved. Seven disputed ballots are before the Court. In determining the validity of some, but not all, of the ballots, the Court has resolved the election, but has, nonetheless, made it impossible for election officials to complete the canvass of the election. The canvass constitutes a final determination and complete count of all ballots cast in each election for each candidate and ballot issue. *See* § 13-15-501 *et seq.*, MCA. Leaving two of the seven challenged ballots in limbo, without a declaration of validity or invalidity, will make it impossible for the "total votes for each individual," *see* § 13-15-506(d), MCA, to be certified by the board of county canvassers to the board of state canvassers, and thereafter for the Secretary of State to prepare and file in the official records of his office the final report of the canvassing process.

¶48    It might be assumed that, because the Court is not reversing the District Court's holding on two of the disputed ballots, that the District Court's judgment is affirmed as to those ballots, and they should therefore be counted in favor of Rick Jore. Of course, affirming the District Court's analysis and judgment on two of the contested ballots only serves to cast doubt upon the Court's decision on the remaining ballots.

23

¶49    In support of his argument that this Court should utilize a deferential review of the determination of voter intent made by local election officials, Jore offers the holding of the West Virginia Supreme Court of Appeals in *State ex rel. Bowling v. Greenbrier County Comm'n*. As Jore correctly notes, the Court in *Bowling* held that the trial court erred when it overturned the voter intent decisions made by the local election commission, and further held that deference must be given to the work of such local commissions. *Bowling*, 575 S.E.2d at 262. *Bowling* is on-point authority in support of Jore's argument.

¶50    However, the Court fails to address the purpose for which Jore has cited *Bowling* and instead seizes on the *result* in *Bowling*, which it finds supportive to the result here, thus concluding that *Bowling* cannot support Jore's standard of review argument. *See* ¶ 11. The Court's unresponsive avoidance of Jore's actual argument notwithstanding, it is not *Bowling*'s *result* which is significant, but, rather, the analysis that case offers regarding the proper review of the very questions now pending before this Court. That is the purpose for which Jore has cited it.

¶51    The point which the Court avoids is *Bowling*'s holding that the determination of a voter's intent from a disputed ballot is an issue of fact which has initially been made by officials employed to do so–a factual decision which should be deferred to:

> [W]hat did the voter intend, or was it impossible to ascertain that intent with reasonable certainty? . . . A question about a matter of fact–the ascertainability of the voter's intent, and what that intent, if ascertainable, was–is squarely within the province of the finder of fact, the Commission. While we recognize that in the instant case reasonable minds can certainly differ on the answer to this question, that disagreement serves nicely to make the point that a court should not in such a case say that the Commission was clearly wrong in making its factual determination.

24

*Bowling*, 575 S.E.2d at 262 (citation omitted). The *Bowling* court reasoned that, in the absence of evidence of fraud, courts "should be cautious about 'monkeying' with the reasoned determinations of designated election officials–*particularly when judicial intervention would result in the disenfranchising of voters*." *Bowling*, 575 S.E.2d at 259 (emphasis added). Of course, that is what this Court is doing today–disenfranchising voters–because it believes local election officials misinterpreted the ballots at issue. In doing so, the Court insists, in contrast to *Bowling*, that its review of the facts illustrating voter intent should be *de novo*, offering two reasons: (1) that "nothing" in the 2003 statutory amendments "suggests a desire on the part of the Legislature to give increased discretion to local election officials," *see* ¶ 28; and (2) that "nothing" in the 2003 amendments "statutorily overruled this Court's precedents, " *see* ¶ 12. I submit that, by insisting that its sees "nothing," the Court ignores the elephant in the room.

¶52 Whether or not the Court can see it or will acknowledge it, there has been an undeniably historic upheaval in the law governing elections in the last four years, including fundamental changes in the process of voting and of counting ballots. The United States Supreme Court has declared that the Constitution prohibits "arbitrary and disparate treatment of the members of the electorate." *Bush v. Gore* (2000), 531 U.S. 98, 105, 121 S.Ct. 525, 530, 148 L.Ed.2d 388, 399. We now understand that the Constitution requires the "formulation of uniform rules to determine voter intent" with regard to recurring voter practices in marking a ballot and the application of such uniform rules. *Bush*, 531 U.S. at 106. Ballots must be judged in accordance with these uniform standards in order to guard

constitutional rights. Unfortunately, the Court today simply tosses the "uniform rules to determine voter intent" which were formulated by the legislative and executive branches in response to this constitutional mandate, concluding that they don't apply, *see* ¶ 25, thereby tossing the very mechanism that guarantees the constitutional rights of the voters. This re-creates the very problem criticized in *Bush*: "the problem inheres in the absence of specific standards." *Bush*, 531 U.S. at 106. The Court's message: the other branches of government can do whatever they want, but we will determine voter intent on our own terms–and without the new constitutional standards. The Court thus invalidates the challenged ballots on the basis of its "*de novo* review"–in actuality, the personal reactions or opinions of individual justices.

¶53 Believing our duty is to interpret and apply the law as enacted, I turn to that law. Regarding standard of review, the Court first concludes that nothing in the 2003 amendments "suggests a desire of the Legislature to give increased discretion to local election officials." I partly agree. The 2003 amendments did not *suggest* increased discretion in local officials. They *required* it.

¶54 After long and careful study, the Legislature enacted a new system of balloting in 2003 and mandated that local election boards "shall count and determine the validity of each vote in a uniform manner." Section 13-15-206(1), MCA. In a dramatic departure from the past, "questionable votes" were required to be counted if the voter's intent could be "clearly determined and agreed upon by a majority of local election judges" who would apply the uniform standards adopted by the Secretary of State. Section 13-15-206(4)(a), MCA. Thus,

the new process required the review and action of local judges, who would count a questionable ballot on the basis of a *majority vote of the election judges applying uniform standards* to interpret voter intent. Inherent in this new process–including the majority vote–is the exercise of discretion by the local election officials.[1]

¶55    The uniform standards, mandated and incorporated by statute, were, after deliberate study, adopted by the Secretary of State. The Court's erroneous application of these standards is hereinafter discussed. Charged with applying the new standards, election judges were thus given the duty of interpreting such voter indications as "hesitation mark," "heavy mark," "partially completed mark," "connective line or arrow," "no clear mark," "residue," "some erasure," "no erasure," "words," "statements" and whether a voter's marks are "consistent." The daunting task of interpreting such subjective voter indications well illustrates the discretion placed with local officials.

¶56    But the officials were provided assistance in accomplishing this task. Election judges were then *trained* in application of the uniform standards. One element of the Florida recount process faulted in *Bush* was election judges "who had no previous training in handling and interpreting ballots." *Bush*, 531 U.S. at 109. That defect was specifically avoided here, as the record reflects that local election judges were trained in the interpretation of voter intent. The significance of training has been completely overlooked by this Court, insisting

---

[1]I use the term "local officials" generically. The detailed process involved in handling and counting ballots includes an observation board, receiving board, inspection board, duplication board, write-in tally board, ballot tabulation board, ballot sealing board, election results board, and resolution board. *See* Rule 44.3.1765 *et seq.*, ARM.

that supreme court justices can interpret ballots by de novo review, without training and without experience, better than trained and experienced election officials can. However, unlike election officials, who have reviewed numerous ballots in the course of their training and experience, the justices of this Court have had precious little experience in interpreting voter intent from marks made on a ballot.

¶57    For these reasons, I disagree with the Court's conclusion that the new voting process did not provide discretion to local officials. To the contrary, discretion was specifically given to those officials, and they were trained in the exercise of it. Here, a bipartisan election board exercised that discretion by unanimously voting to count the seven challenged ballots. I believe that this Court, untrained and inexperienced in ballot interpretation, should review the work of election officials, who by training and experience are exposed to numerous questionable ballots, under the same kind of deferential standard we usually employ when reviewing agency determinations based on agency training and expertise, that is, whether the agency's findings of fact are clearly erroneous as unsupported by substantial evidence.

¶58    Neither is it correct to say that "nothing" in our case law has been changed. The Court repeats our prior holdings as if reiteration will somehow preserve their validity in the post-*Bush* world: "this Court has insisted that the voter's intent be clear without any speculation." *See* ¶ 22. The Court can insist and repeat these holdings all it wants, but they are no longer the law, and it is simply arrogant to hold otherwise. Whether we deem the change good or evil, the reality is that new standards have been placed in the law which now

28

require an assessment of ballots which have confusing or contradictory indications. Obviously, the task of determining voter intent from these various actions may not be easy–indeed, it may be frightfully difficult to determine voter intent from such indicators as "hesitation marks," thus underscoring the need for training–but it is a task that cannot be avoided by closing our eyes to the new standards and simply reciting our outdated case law, even if we believe that our old law provided a superior standard.

¶59 Our case law was decided prior to the development of the new voting process, including the adoption of uniform standards for interpretation of voter marks, training in ballot interpretation, ballot review or "clarification" and the exercise of discretion by local officials who are required to vote on these matters. The law, that is, § 13-15-206(4)(a), MCA, and the standards incorporated thereby, now require "questionable votes" to be *counted*, if, by a majority vote of election officials, voter intent can be determined pursuant to the uniform standards. It then becomes the task of the courts to determine whether those officials properly exercised their discretion. Courts should let officials do the job they are supposed to do, and then review their work accordingly. This Court is not designated to be, and, very importantly, is not trained to be, election judges. *This* is the import of the *Bowling* case–an understanding of the proper role of the courts. I now turn to what should be this Court's appropriate task.

¶60 Review of the evidence relied upon by the local officials and reviewed by the District Court begins with the most critical fact, largely ignored by the Court: that on all seven contested ballots, there is a clear, complete, accurately marked, unencumbered by any other

29

mark, unmistakable vote in favor of Rick Jore. Then, all of the ballots have a *second* designated voting area marked as well, that is, the circular voting area is also filled in for Jack Cross. However, each ballot also contains some additional mark or indication made by the voter on or near the second voting area. The question then becomes, how should these additional markings be interpreted?

¶61 The Court holds that these ballots cannot be interpreted because none of the uniform standards apply to this situation, *see* ¶ 25, and must therefore be invalidated. However, the election judges trained in ballot interpretation thought differently, as did the District Court. Both the judges and the trial court applied Rule 44.3.2402(1)(h), ARM, which provides as follows:

> The following general rules shall apply in a count or recount of paper and opti-scan ballots:
>
> . . . .
>
> (h) more than one designated voting area has been marked, but a clear word, mark or statement is used to indicate the correct vote. The election official shall clarify the ballot and cause a vote to be counted for the designated voting area indicated as the correct vote.

The facts here fall under this Rule. There is "more than one designated voting area" which was marked. Further, on all seven ballots, there is clear evidence of additional markings–"word, mark or statement"–made by the voter in each case. Under the Rule, it thus became incumbent upon the election officials to "clarify the ballot" and determine whether they could clearly count the ballot for the voter's correct choice. *Unanimously*, the bipartisan local board voted that these ballots, with their individual markings, were

30

accurately voted for Rick Jore pursuant to Rule 44.3.2402(1)(h), ARM, and the District Court affirmed their decision.

¶62    Exercising a proper, deferential review of the seven ballots, I would conclude that there is substantial evidence to support the findings of the election judges. Five of the ballots have large "X's" drawn through the marked voting areas for Jack Cross while the marked voting area for Rick Jore is undisturbed. The sixth ballot has an erasure or smudge in part of the marked voting area for Jack Cross, as well as a large squiggly line drawn through and extending above, below and on either side of the marked voting area for Jack Cross, while the marked voting area for Rick Jore is again undisturbed. The seventh ballot has a smudge or erasure and a small squiggly line through part of the marked voting area for Jack Cross, a separate line running through the word "Jack" and most, if not all, of the word "Cross" before continuing to the word "Republican," and three initials or letters written adjacent thereto; again, the marked voting area for Rick Jore is undisturbed.

¶63    All of these ballots fall neatly within a single, factual category governed by Rule 44.3.2402(1)(h), ARM: all of the voters indicated two choices on their ballot, only to go back and, by way of additional markings, eliminate their choice for Jack Cross and allow their vote for Rick Jore to stand undisturbed, thereby clearly indicating their intent, or "correct vote." This amply demonstrates that the actions of the election judges were supported by substantial evidence.

¶64    Having reached this conclusion, it remains only to point out that the Court's conclusion that these ballots violated the "clear instructions posted for voters at each voting

31

station" to ask for a new ballot, *see* ¶ 35, is simply irrelevant, and only serves to create the mistaken impression that this is the law. While we would hope that voters would ask for a new ballot when a mistake is made, and even request them to do so, experience–as found by the District Court–tells us that they rarely will. More to the point, however, the law does not require it. To the contrary, the law requires election judges to attempt to "clarify" ballots which are marked with multiple markings. Indeed, the law now specifically *anticipates* such situations. The election judges in this case fulfilled the law as they were supposed to, and I would affirm. By reversing the credible actions of local officials and the application of the law's uniform standards for determining voter intent, the Court today has disenfranchised voters and abandoned the constitutional principles required by *Bush*. Further, the Court has signaled that no election dispute can be resolved until contested ballots are reviewed by supreme court justices. For what reason did this Court deny original jurisdiction and require that the District Court undertake the matter? It did so because there is a statutory process that is supposed to mean something. Today, the Court has declared it does not.

¶65    I would affirm the District Court.


/S/ JIM RICE

32