2006-NMCA-153

149 P.3d 118

**Howard CALKINS, Contestant–Appellee/Cross–Appellant,**

v.

**Robert STEARLEY, Contestee–Appellant/Cross–Appellee.**

**No. 25,790.**

Court of Appeals of New Mexico.

Nov. 7, 2006.

Dennis K. Wallin, The Law Offices of Dennis K. Wallin, P.C., Moriarty, NM, for Appellee/Cross–Appellant.

Robert E. Tangora, Robert E. Tangora, L.L.C., Santa Fe, NM, for Appellant/Cross–Appellee.

**OPINION**

WECHSLER, Judge.

{1} This case is an election contest of the Town of Edgewood mayoralty election in 2004. The canvassing board certified that Contestee Robert Stearley won by one vote. He was awarded the certificate of election. Contestant Howard Calkins timely contested the election. The Town of Edgewood inter-

vened as a party. After trial, the district court determined that three Stearley voters and two Calkins voters were ineligible to vote because they did not reside within the Town of Edgewood. The district court also determined that a voter whose name did not appear on the voter registration list and who voted on a "required challenge" ballot for Calkins did not cast a vote that should be counted, and further, that a voter who entered the voting machine but did not activate the indicator to cast a vote should not have her vote counted for Stearley, for whom she testified she voted. The district court, therefore, concluded that the election resulted in a tie vote, necessitating a decision by impartial lot under NMSA 1978, § 3–8–60 (1985).

■ {2} The issues on appeal are framed by Stearley's appeal and Calkins' cross-appeal. Stearley argues that Calkins could not challenge the legality of non-resident voters in an election contest in district court unless he first exercised a challenge before or during the election. He also argues that the vote of the voter who did not activate the vote cast indicator, Dorothy Brown, should be counted. Calkins argues that the vote of the voter who voted by required challenge ballot, Madelyn Hastings, should be counted. Neither contends that the non-resident voters were qualified to vote. Because all issues raised are matters of statutory interpretation, we afford them de novo review, after considering factual findings for substantial evidence. See Ponder v. State Farm Mut. Auto. Ins. Co., 2000–NMSC–033, ¶ 7, 129 N.M. 698, 12 P.3d 960. We hold that the Municipal Election Code, NMSA 1978, § 3–8–64 (1985), permits a candidate to challenge the legality of voters in district court without challenge prior to or during the election. We additionally hold that the district court properly addressed the votes at issue. We affirm the judgment of the district court.

## TIMING OF CHALLENGES

{3} Election statutes provide various means to challenge the legality of a registered voter. Under NMSA 1978, § 1–4–22(A) (1995), the secretary of state, county chairs of major political parties, and twenty county voters may petition prior to an election to cancel the voter registration of persons improperly registered. Under NMSA 1978, § 3–8–31(A)(1) (1999), candidates may appoint challengers for polling places in a municipal election. These challengers, as well as election officials, may challenge the qualifications of a voter at the polls or the reading of absentee ballots. NMSA 1978, § 3–8–43(A) (2003); NMSA 1978, § 3–9–15 (1999). If a challenge at the polls is affirmed by election judges in a municipal election, the vote of the challenged voter is collected in a sealed envelope with the voter's name and labeled as rejected. Section 3–8–43(B)(1)(c).

{4} This case poses the question of whether these statutes are the exclusive means to challenge a non-resident voter in a municipal election. The question raises the tension between efficiency and finality on the one hand and completeness in the purity of the electorate on the other.

{5} Both sides of this question stake claim to the high ground. In arguing exclusivity, Stearley states that prohibiting post-election challenges eliminates the desire for political advantage from the challenge process, thereby protecting the fairness of the process and the purity of the election. He further states that requiring candidates to exercise the statutory challenge procedures and limiting post-election challenges to discrepancies that could not be reasonably discovered before or during the election promotes the interest of the electorate in finality without unduly burdening the process with post-election disputes concerning voter qualifications. The procedure Stearley promotes is described in the context of a collective bargaining election under the National Labor Relations Act in NLRB v. A.J. Tower Co., 329 U.S. 324, 67 S.Ct. 324, 91 L.Ed. 322 (1946).

One of the commonest protective devices is to require that challenges to the eligibility of voters be made prior to the actual casting of ballots, so that all uncontested votes are given absolute finality. In political elections, this device often involves registration lists which are closed some time prior to election day; all challenges as to registrants must be made during the intervening period or at the polls. Thereafter it is too late. The fact that cutting off the

right to challenge conceivably may result in the counting of some ineligible votes is thought to be far outweighed by the dangers attendant upon the allowance of indiscriminate challenges after the election. To permit such challenges, it is said, would invade the secrecy of the ballot, destroy the finality of the election result, invite unwarranted and dilatory claims by defeated candidates and keep perpetually before the courts the same excitements, strifes, and animosities which characterize the hustings, and which ought, for the peace of the community, and the safety and stability of our institutions, to terminate with the close of the polls.

*Id.* at 331–32, 67 S.Ct. 324 (internal quotation marks and citation omitted).

{6} The opposite position pursues the purity of the election by continuing the purging process through post-election review. With such a goal, every opportunity is afforded to purge unqualified voters in order to give full effect to the will of the majority of qualified voters. *See Kiehne v. Atwood,* 93 N.M. 657, 661–62, 604 P.2d 123, 127–28 (1979). This policy, by extending the process, more fully embraces completeness at the expense of efficiency. The policy proposed by Stearley embraces finality, to some extent sacrificing completeness, but, as argued by Stearley, removes the motives necessarily contained in a post-election challenge to change the victor in the process.

{7} Stearley brought this contest under Section 3–8–64(A), which addresses an election contest in a municipal election. *See also* NMSA 1978, § 1–14–4 (1969) (addressing election contests in non-municipal elections). Section 3–8–64(A) provides:

Judgment shall be rendered in favor of the person legally qualified to take office for whom a plurality of the legal votes shall be proven to have been cast in accordance with 3–8–32 NMSA 1978, and shall be to the effect that the person is entitled to the office in controversy with all the privileges, powers and emoluments belonging thereto and for his costs. If the contestant prevails, then that person shall have judgment placing the contestant in possession of the contested office and for the emoluments thereof from the beginning of the term for which the contestant was elected and for costs.

{8} We have previously discussed Section 3–8–64(A) in *Darr v. Village of Tularosa,* 1998–NMCA–104, 125 N.M. 394, 962 P.2d 640. In that case, also a municipal election contest, there were irregularities in the election process involving non-resident voters and voters who received absentee ballots but voted in person. *Id.* ¶¶ 3, 5. The district court rejected the results of the election based on NMSA 1978, § 3–8–67 (1985), which permits such a result if election officials fail to substantially comply with their responsibilities under the Municipal Election Code. *Darr,* 1998–NMCA–104, ¶ 6, 125 N.M. 394, 962 P.2d 640. We held that the district court erred because, despite the "impurity" of the process, the district court could have determined the "lawful winner" of the election by identifying the persons who voted unlawfully and, through the testimony of those persons or other circumstantial evidence, excluding their votes. *Id.* ¶¶ 13–16, 18. Through Section 3–8–64(A), we avoided disenfranchising the lawful voters and accomplished "the essential principle of the elective system … that the will of the majority of the qualified voters shall determine the right to an elective office." *Darr,* 1998–NMCA–104, ¶ 17, 125 N.M. 394, 962 P.2d 640 (alterations in original omitted) (internal quotation marks and citation omitted).

{9} We note that, in *Darr,* we mentioned the exclusivity of the statutory means of challenging unqualified voters in passing. *Id.* ¶ 4. The district court had stated that it ordinarily would have considered the failure to challenge on the election day as a waiver, but would not because of confusion concerning voter eligibility caused by statements of officials. *Id.* Apparently, this issue was not raised in the case because we did not otherwise discuss it. *Id.* We nevertheless held that the district court could have entertained the challenges as part of a Section 3–8–64(A) analysis. *Darr,* 1998–NMCA–104, ¶ 20, 125 N.M. 394, 962 P.2d 640. We believe that *Darr* counsels that such an analysis is not improper in appropriate circumstances, in the effort, under Section 3–8–64(A), to deter-

mine the lawful winner in a municipal election contest. We do not believe that the circumstances of this case, in which the electorate is discrete and the number of challenges is small, justifies a different result.

{10} Stearley relies on *A.J. Tower Co.*, in which the United States Supreme Court upheld the NLRB's policy prohibiting post-election challenges on an abuse-of-discretion standard. *A.J. Tower Co.*, 329 U.S. at 332–33, 67 S.Ct. 324. *A.J. Tower Co.* involved a collective bargaining election under the National Labor Relations Act, and the election was conducted in accordance with an agreement between the union and the respondent, which provided for challenges of the voters' eligibility before or at the time of voting. *Id.* at 325–26, 67 S.Ct. 324. The agreement designated a director to investigate and report on challenges. *Id.* at 326, 67 S.Ct. 324. The respondent challenged a voter's eligibility four days after the election on the ground that she was not an employee and therefore was ineligible to vote. *Id.* at 327, 67 S.Ct. 324. In the closed setting of an NLRB election, after setting forth the above-quoted policy statements, the Supreme Court upheld the denial of the challenge based on the NLRB's general rule that a ballot cannot be challenged after it "has been cast without challenge and its identity has been lost." *Id.* at 332, 67 S.Ct. 324.

{11} Significantly, one case upon which Stearley principally relies was decided on the basis of insufficient ballot identity. In *Opinion of the Justices*, 371 A.2d 616 (Me.1977), the Maine Supreme Court, addressing the timing of a challenge to absentee ballots, held that the challenge had to be made before the ballots are counted because "once the envelopes and [the] applications [for the absentee ballots] are separated from the ballots" a subsequent challenge must "be limited to facial defects in the ballots, or irregularities common to whole classes of identifiable ballots." *Id.* at 621. But with a court's ability to examine the vote of an ineligible voter, the loss of the identity of the vote, or the loss of the connection between a vote and a challenged voter, is of diminished import. The significant fact is the identity of the ineligible voter, because the voter can testify about the vote cast.

{12} The last case upon which Stearley relies, *Veuleman v. O'Con,* 417 So.2d 131 (La.Ct.App.1982), was based on a Louisiana statute that expressly provided the proposition that Stearley proposes—that an irregularity in the conduct of an election that could have been raised by challenge or objection at the polls with exercise of due diligence was waived. *Id.* at 133. New Mexico's Municipal Election Code has no such provision. Although reading the statutory challenge provisions to be exclusive as Stearley argues would reduce post-election conflict and streamline the process to achieve finality, Section 3–8–64(A) allows the district court to determine the lawful winner of a municipal election. The only time limitation is found in NMSA 1978, § 3–8–63(C) (1999), which requires that the "complaint shall be filed no later than thirty days from issuance of the certificate of election ... or thirty days after completion of canvassing for elections."

{13} In view of Section 3–8–64(A) and the ability of the district court to inquire into the votes illegally cast by ineligible voters, we do not construe the Municipal Election Code to include such a limiting provision without a clearer statement of legislative intent to the contrary. *See, e.g., Cal. First Bank v. State,* 111 N.M. 64, 75, 801 P.2d 646, 657 (1990) (refusing to adopt a construction of a statute that would be contrary to public policy "[a]bsent some clear indication of a contrary legislative intent"). We thus conclude that our legislature has allowed the challenges under Section 3–8–64(A) in this case through post-election challenges to the qualifications of voters, even though such challenges may impair the efficiency of the process.

## VOTE OF DOROTHY BROWN

{14} Dorothy Brown, who is elderly, entered the voting booth with her daughter, Lois Fols, for physical assistance. Both were eligible voters, signed the signature roster, and were given voting slips by precinct officials. They only cast one vote between them and left the polling place. Precinct officials noted that only one vote was cast. Both Fols and Brown testified at trial that they voted for Stearley. The district

court found that Fols cast her vote and that Brown intended to cast her vote for Stearley, but failed to activate the cast vote indicator.

{15} Stearley contends that Brown's vote should be counted. Citing *Kiehne*, he contends that nothing in the Municipal Election Code expressly prohibits counting it and election laws should be construed to give effect to the will of the electorate. One of the issues in *Kiehne* involved the legality of voters by absentee ballot who knew when they applied for an absentee ballot that they would be present in the county on election day. *Kiehne*, 93 N.M. at 663, 604 P.2d at 129. Our Supreme Court determined that it should not adopt a policy that prohibited all such votes because there was no provision in the election law expressly addressing the situation that voided an absentee ballot if the voter casts the ballot and then is present in the county for the election. *Id.* at 664–66, 604 P.2d at 130–32.

{16} There is, however, a statutory provision that expressly addresses Brown's situation, obviating any need for us to entertain any presumption in construing the election laws. NMSA 1978, § 1–9–4.2(A) (2003), provides:

A vote on a touch-screen direct recording electronic voting system or electronic voting system consists of a voter's selection of a candidate or answer to a ballot question selected by the electro-optical ballot display of the device, followed by the voter activating the cast vote indicator.

Because a vote on a machine such as that used in this election requires by definition "the voter activating the cast vote indicator," we conclude, as did the district court, that Brown did not cast a legal vote. *Id.*

{17} In light of Section 1–9–4.2(A), Stearley contends that the precinct board nevertheless has the responsibility to correct "an imperfect vote" as cast by Brown. By virtue of NMSA 1978, § 3–8–55(A)(2), (3) (1999), a municipal precinct board must meet after an election and "make the necessary corrections or supply omissions . . . if it appears . . . that there is a discrepancy within the election returns" or "a discrepancy between the number of votes set forth in the certificate for all candidates and the number of electors voting as shown [on] the election returns." Indeed, such a discrepancy existed. The election returns include "the certificate showing the total number of votes cast for each candidate, . . . signature rosters, registered voter lists, [and] machine printed returns." NMSA 1978, § 3–8–2(B)(6) (2003).

{18} Precinct officials noted on the signature roster that Brown did not cast a vote and further noted that the election returns include an extra signature because Fols and Brown voted at the same time. The election returns did not provide a basis to correct the discrepancy. The question then becomes whether the precinct board's responsibility included contacting Brown to determine if she did not intend to vote, and, if she did, to obtain her vote. We think not. The precinct board reviews the election returns and has the statutory mandate to make corrections or supply omissions that appear from the election returns. Section 3–8–55(A). Section 3–8–55(A) does not provide authority to investigate discrepancies outside the election process or to extend the voting process to clarify votes. To be sure, our electoral system makes every effort to uphold the secrecy and fairness of the ballot. *See, e.g.,* N.M. Const. art. VII, § 1 ("The legislature shall enact such laws as will secure the secrecy of the ballot, the purity of elections and guard against the abuse of elective franchise."); NMSA 1978, § 1–14–13 (1969) (providing that the votes of a precinct shall be rejected when "the secrecy and sanctity of the ballot" was not protected); NMSA 1978, § 3–8–1(B) (1995) (listing the purposes of the Municipal Election Code); Rule 11–507 NMRA (recognizing the privilege of a legal voter to refuse to disclose the person's vote); *Kiehne*, 93 N.M. at 660, 604 P.2d at 126 ("The sanctity of a New Mexican's ballot is undoubtedly one of his most cherished and jealously-guarded rights."); *State ex rel. Read v. Christ*, 25 N.M. 175, 200, 179 P. 629, 637 (1919) (noting the overwhelming importance of "the secrecy and purity and security of elections"); *Darr*, 1998–NMCA–104, ¶ 14, 125 N.M. 394, 962 P.2d 640 (stating that "the secrecy of the ballot is in most respects sacrosanct in this country").

{19} The notations on the election returns explained to the precinct board the reason for the discrepancy. A qualified voter has the right to enter the voting machine and decide to not cast a vote. The precinct board's inquiry after the election would allow such a voter to change such a decision. We do not believe that the legislature contemplated such action. Rather, Section 1–9–4.2(A) controls by defining a vote to exclude circumstances in which the vote is not activated. Brown had the responsibility to properly cast her vote. The district court correctly ruled that Brown did not vote.

## VOTE OF MADELYN HASTINGS

{20} Madelyn Hastings has lived in the Town of Edgewood since 1994 and was a registered voter. She resides at 22 Sanford Road with her husband, Charles Nilson, and son. Hastings went to the polling place on election day, attempting to vote. Precinct workers informed her that she was not listed on the signature roster. Her husband's name was listed. Precinct workers told her that they would call the county clerk to verify her registration. She left the polling place to run errands. When she returned thirty to forty-five minutes later, she was told to complete a required challenge ballot, which she did. She voted for Calkins and believed her vote counted.

{21} Apparently, Hastings was not listed on the signature roster because of the address on her voter registration. Approximately two months prior to the election she received a voter registration card from the county clerk that had the address of 2038–B Old U.S. 66, the address used for her residence prior to its incorporation into Santa Fe County. Hastings did not read the new card or check the information on it. The others in her household did not receive new cards, and she assumed the county clerk made a mistake in not issuing them new cards.

{22} Calkins contends in his cross appeal that Hastings' vote should be counted. He contends that it is not disputed that she was a qualified elector and that she was disenfranchised by the mistakes of the county clerk.

{23} In support, Calkins points to the required challenge vote of Cheryl Huppertz that was counted by the precinct board. Huppertz's name did not appear on the signature roster. Her husband's name also did not appear, but he was issued a certificate of eligibility and voted on the voting machine. When Huppertz was not issued a certificate of eligibility, her husband went to the city clerk's office to inquire. The city clerk called the county clerk's office and learned that there had been a mistake and that Huppertz and her husband lived at the same address. The city clerk received a copy of Huppertz's certificate of eligibility from the county clerk's office later the same day, the day of the election.

{24} We agree with Calkins that a series of mistakes interfered with Hastings' vote. The county clerk apparently issued a registration card with the wrong address. When the precinct worker called the county clerk, he was informed that Hastings was not on the roster; the clerk did not issue a certificate of eligibility. However, Hastings also did not review her registration card when she had the opportunity to have the mistake corrected.

{25} As with Brown's situation, there is a statutory provision that expressly addresses Hastings' vote. Under NMSA 1978, § 3–8–40(B), (C) (2003), a voter whose name is not on the signature roster may nevertheless be permitted to vote as if the voter's name were on the roster if the voter meets certain specific requirements, including a certificate of eligibility from the county clerk. When a person whose name is not on the signature roster and who does not meet these specific requirements, including having a certificate of eligibility, seeks to vote, the precinct workers are required to follow the procedure for a required challenge ballot. Section 3–8–43(C). Under these procedures, the person completes a paper ballot, which is placed in an envelope marked "rejected-required challenge" and sealed with the person's name. Section 3–8–43(C)(5). The statute states without qualification that "the rejected ballot shall then be deposited in the ballot box and shall not be counted." *Id.*

{26} Section 3–8–43(C) is mandatory. *See Kiehne*, 93 N.M. at 664, 604 P.2d at 130

(stating "that only when the Legislature *expressly provides* that deviation from the prescribed procedure prevents the counting of the vote will the ballot be declared void"). It does not leave room for the canvassing board's discretion.

{27} Our Supreme Court addressed a similar provision in *Christ*, 25 N.M. 175, 179 P. 629. Our Supreme Court refused to count "spurious" ballots cast by voters who were qualified to vote and believed that they had cast votes that would be counted. *Id.* at 178–81, 179 P. at 629–31. A statute mandated that "[b]allots other than those printed by the respective county clerks according to the provisions of this article shall not be cast, counted or canvassed in any election." *Id.* at 180, 179 P. at 630 (internal quotation marks and citation omitted). Our Supreme Court held that the ballots could not be counted:

> [I]t is probably better that individual voters and candidates should suffer in a given instance than that the doors to fraud and imposition may open and the secrecy and purity and security of elections be destroyed. We feel confident, however, that the practical consensus of opinion is that under a constitutional provision like ours [—providing] in section 1 of article 7 that "the Legislature ... shall regulate the manner, time and place of voting" [and that] "[t]he Legislature shall enact such laws as will secure the secrecy of the ballot, the purity of elections and guard against the abuse of elective franchise"— the Legislature has power to provide, as it did provide by the section of the statute heretofore set out, that only official ballots emanating from a proper official source should be cast, counted, or canvassed. That the statute is mandatory and requires us to enforce it without interpolation and without resort to subtle and unsound methods of interpretation in order to save the voter and the candidate from defeat must be admitted by all. It follows that the votes questioned were illegal votes, and could not be cast, counted, or canvassed....

*Id.* at 199–200, 179 P. at 637. Likewise, in the case of Ms. Hastings, we must conclude that there is no reasonable interpretation of the law that would enable us to count her vote. We therefore agree with the district court that Hastings' vote could not be counted.

{28} We agree with Calkins that the circumstances of the Huppertz vote are similar. We do not rule on the Huppertz vote because it is not at issue. The Hastings vote is nonetheless different in that Huppertz was issued a certificate of eligibility on election day.

## AUTHORITY OF THE DISTRICT COURT

■ {29} The dissent would hold that Section 3–8–64(A) confers power on the district court to determine the intent of all voters who were qualified to vote and attempted to vote. We do not believe Section 3–8–64(A) goes so far. Rather, Section 3–8–64(A) allows the district court to determine for which candidate a majority of the "legal votes" was cast. A "legal vote" is not, as the dissent claims, an intention to vote by a legal voter. Rather, it is a vote cast in accordance with legislatively-mandated procedures. *Black's Law Dictionary* 1607 (8th ed.2004) (defining "legal vote" as "[a] vote cast in the proper form and manner for an eligible choice by someone entitled to vote"). Because we have concluded that neither Brown nor Hastings cast a legal vote in accordance with the procedure mandated by our legislature, neither of their votes may be counted by the district court in determining the winner of the election.

■ {30} As the dissent articulates, the right to vote is of paramount importance and statutes should be interpreted to favor voters. Our courts long recognized that "[w]here any reasonable construction of the statute can be found which will avoid [wholesale disenfranchisement of qualified electors through no fault of their own], the Courts should and will favor it." *Darr*, 1998–NMCA–104, ¶ 17, 125 N.M. 394, 962 P.2d 640 (internal quotation marks and citation omitted) (second alteration in original); *see also, e.g., State ex rel. Walker v. Bridges*, 27 N.M. 169, 174, 199 P. 370, 372 (1921) ("If, therefore, the regulations of elections may be reasonably construed to entitle the citizen to vote, it should be done."); *Christ*, 25 N.M. at 199, 179 P. at 637 ("The voter should not

lightly be deprived of his right, nor should the successful candidate suffer, if by any reasonable interpretation of the laws governing elections it can be prevented."). The right to vote is nevertheless constrained by the statutes governing voting, and we may not interpret statutes in an unreasonable way to facilitate voting.

## CONCLUSION

{31} Because Calkins' challenge was timely under the Municipal Election Code, and because the district court correctly concluded that the election resulted in a tie vote, we affirm the judgment of the district court.

{32} **IT IS SO ORDERED.**

I CONCUR: MICHAEL D. BUSTAMANTE, Chief Judge.

MICHAEL E. VIGIL, Judge (concurring in part and dissenting in part).

VIGIL, Judge (concurring in part and dissenting in part).

{33} The majority concludes that the votes of Dorothy Brown and Madelyn Hastings may not be counted under the Municipal Election Code, NMSA 1978, §§ 3–8–1 to –80 (1965 as amended through 2003), and 3–9–1 to –16 (1973, as amended through 2003), even though the undisputed evidence before the district court demonstrated: (1) they were both qualified to vote in the 2004 Edgewood mayoral election; (2) they both went to polls to vote; (3) they both voted; and (4) who they voted for. In arriving at its conclusion the majority unduly restricts the power of a district court in deciding an election contest under Section 3–8–64(A), which results in disenfranchising qualified voters. I am unable to agree with this conclusion and therefore dissent.

{34} Our constitution declares:

All political power is vested in and derived from the people: all government of right originates with the people, is founded upon their will and is instituted solely for their good.

N.M. Const. art. II, § 2. This fundamental principle of democracy is animated into life by the vote of free citizens because the very essence of democracy lies in the free exercise of the constitutional right to vote. As stated by our Supreme Court, "the supreme right guaranteed by the Constitution of the state is the right of a citizen to vote at public elections." *Bridges,* 27 N.M. at 174, 199 P. at 372. *See also Christ,* 25 N.M. at 199, 179 P. at 637 (stating that the right to vote is the "highest right of the citizen"); *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined."); *Yick Wo v. Hopkins,* 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (stating the right to vote is regarded as a fundamental right because it preserves all other rights). Not only do citizens have a constitutional right to vote, they have a constitutional right to have their votes counted:

[T]here is ... a constitutional mandate to which we must yield, that one which says that the person receiving the highest number of votes shall be elected to office; as well as the often announced principle that voters will not be denied their rightful voice in government absent a certain and controlling conflict with a more compelling consideration, that of the public interest to be served in the preservation of the validity of elections.

*Valdez v. Herrera,* 48 N.M. 45, 54, 145 P.2d 864, 869–70 (1944) (quoting in *Darr,* 1998–NMCA–104, ¶ 17, 125 N.M. 394, 962 P.2d 640); *see also Wesberry,* 376 U.S. at 17, 84 S.Ct. 526 (stating that the constitutional provision requiring the election of members of the U.S. House of Representatives gives citizens qualified to vote a constitutional right to vote and to have their votes counted).

{35} To these ends, the legislature has declared:

It is the purpose of the Municipal Election Code to:

(1) secure the secrecy of the ballot;

(2) secure the purity and integrity of elections;

(3) guard against the abuse of the elective franchise; and

(4) provide for the efficient administration and conduct of elections.

Section 3–8–1(B).

{36} The meaning of the phrase to "guard against the abuse of elective franchise" includes but is not limited to insuring that the right of citizens to cast votes for candidates they favor is not impaired. Recognizing that the constitutional right of citizens to vote for the candidate of their choice (N.M. Const. art. VII, § 1) and the constitutional right of the candidate who receives the highest number of votes to take office (N.M. Const. art. VII, § 5) are intertwined, the legislature enacted Section 3–8–63 in 1985, which permits any unsuccessful candidate for election to a municipal office to contest the election by filing a verified complaint of contest in the district court. In turn, Section 3–8–64(A) directs in pertinent part:

> Judgment shall be rendered in favor of the person legally qualified to take office for whom a plurality of the legal votes and shall be proven to have been cast in accordance with [Section 3–8–32], and shall be to the effect that the person is entitled to the office in controversy with all the privileges, powers and emoluments belonging thereto and for his costs.

{37} In the process of construing Section 3–8–64 in *Darr*, we repeated, " '[T]he essential principle of the elective system [is] that the will of the majority of the qualified voters shall determine the right to an elective office[.]' " 1998–NMCA–104, ¶ 17, 125 N.M. 394, 962 P.2d 640 (quoting *Kiehne*, 93 N.M. at 661, 604 P.2d at 127 (alterations in original)). We also said, " '[E]ven if the acts of [election] officers are fraudulent the votes of electors should not be invalidated if it is possible to prevent it.' " *Darr*, 1998–NMCA–104, ¶ 17, 125 N.M. 394, 962 P.2d 640 (quoting *Orchard v. Bd. of Comm'rs of Sierra County*, 42 N.M. 172, 188, 76 P.2d 41, 51 (1938) (alterations in original)). Likewise, our Supreme Court has expressly stated that New Mexico sides with the preponderance of the states by liberally construing statutes "in favor of the voter." *Kiehne*, 93 N.M. at 664, 604 P.2d at 130 (citing *Bryan v. Barnett*, 35 N.M. 207, 292 P. 611 (1930) (holding that absentee voters did not lose their votes even though the applications for ballots were not signed by the voters)).

{38} I therefore conclude that Section 3–8–64(A) is a remedial statute to be liberally construed to ensure that every vote cast by a qualified voter is counted. Under Section 3–8–64(A) the district court must decide two questions after hearing the evidence presented: (1) did a person who was qualified to vote at that particular election at that particular time vote; and (2) who did that person vote for. This is how the district court determines "the legal votes" that were "proven to have been cast" under Section 3–8–64(A). In answering these questions, the district court does not act merely as another canvassing board, and mere technical formality does not govern over substance. I now turn to the specifics of this case.

## THE VOTE OF DOROTHY BROWN

{39} The town clerk of Edgewood has been personally involved in about fourteen municipal elections either as municipal clerk or as a poll worker. She explained that in the voting booth a voter can change her mind about her vote at any time until she presses the "cast vote" button. If that button is never pushed, then the next voter to vote on the machine will "cancel[ ] the other person's vote." The safeguard to insure that two people do not register their votes "on top of one another" is that a precinct worker who is near the machine listens for a "beep" that occurs when the voter hits the "cast vote" button, and when the voter leaves the voting booth, the precinct worker then hits another button on the machine to reset the counter, and the next voter is then allowed to enter the voting booth. "So [it would] be possible if the precinct worker didn't hit that button, that another vote could be recorded over a previous one[.]"

{40} She described the following procedure that was supposed to be followed if the voter did not press the "cast vote" button: "We instruct the precinct workers to be very careful that each voter does press the cast button. If they catch it, then they're able to call the voter back and have them press the

cast vote button, or the precinct judge or the individual that's at the machine can go under the curtain and hit the cast button." Further, "[w]e tell them to be very careful to watch that sort of thing, because those kind of things do happen at elections." When asked if the precinct workers "dropped the ball" and did not handle the situation correctly in the situation involving Ms. Brown and her daughter, she answered, "Again, there are things like that that occur during election day that we try to instruct them, so that they'll be prepared and aware of what things can happen. And it was my understanding that something like that did occur in our municipal election."

{41} The precinct judge testified that his recollection was that two elderly women came in and got in line. "They both had received a slip when you sign in on the voter roster, checked that you were eligible. They both received a slip with a number on it. They both went into the booth, and they both left. But [the voting machine] only cast one vote." They entered the voting booth together because one of them needed assistance from the other, although "[y]ou're supposed to allow one in at a time." When asked if anyone mentioned that only one vote was cast, he answered, "The lady that was running the machine at the time, to my recollection, there was a line. Things were a little confusing. It was busy in there, and they wheeled her out, and the lady thought that she was going to come back and vote again, and it was too late. They were gone."

{42} Ms. Brown's daughter who is elderly testified she recalled bringing her mother to vote and physically helping her mother maneuver with her walker or wheelchair. However, she did not help her mother vote, and her mother went into the voting booth by herself. "No, I didn't help her. She knew who she was going to vote for, and she voted by herself." She believed she voted before her mother, but she was not sure. Further, she was "pretty sure" that she pushed the button to cast her vote, "but I really don't remember."

{43} Ms. Brown is ninety-nine years old, and she "definitely" intended to vote in the election. She alternates between using ei-

ther a wheelchair or a walker and her daughter was not in the voting booth when she actually voted. She voted for Robert Stearley, and specifically remembered that she pushed the button that registered her vote. Upon leaving the voting booth, she believed she had properly voted. After completing her testimony, she said, "I hope you boys can get it straightened out."

{44} In light of the foregoing evidence, several things may have occurred: (1) Ms. Brown failed to activate the cast vote button as found by the district court; (2) Ms. Brown activated the cast vote button but her daughter did not; (3) the poll worker failed to activate the counter reset on the machine, resulting in only one of the votes being counted; or (4) the machine was not working properly and failed to record one of the votes. Whether Ms. Brown failed to properly interact with the technology of the machine, whether the poll worker failed to do her job, or whether the machine itself failed to function properly is really beside the point in this case. We know how Ms. Brown and her daughter voted, and we know they were both qualified to vote on that day in that election, but for some reason one of votes was not recorded by the machine. Nevertheless, the district court concluded, and the majority agrees, that Ms. Brown did not vote because the cast vote indicator was not activated. They rely on Section 1–9–4.2(A), which states:

> A vote on a touch-screen direct recording electronic voting system or electronic voting system consists of a voter's selection of a candidate or answer to a ballot question selected by the electro-optical ballot display of the device, followed by the voter activating the cast vote indicator.

{45} In light of the facts recited above, it is a close question whether the evidence is sufficient to support the district court finding that Ms. Brown failed to activate the cast vote button. Nevertheless, I will assume that it is. Significantly, Section 3–8–64(A) does not itself specify that the district court must find that the votes cast complied with Section 1–9–4.2; it states the district court must find the votes were "legal votes." A vote which complies with Section 1–9–4.2 certainly con-

stitutes a "legal vote" but I respectfully submit that the concept of a "legal vote" is not so limited. Otherwise, there would be no need for a trial under Section 3-8-64(A).

{46} A vote was cast by Ms. Brown for Mr. Stearley and she was legally entitled to vote for him. Her vote was therefore a "legal vote" in that it was made by a "legal voter." Since the machine did not record her vote, a trial was necessary under Section 3-8-64(A). The trial without contradiction demonstrated that Ms. Brown was entitled to vote, that she voted, and who she voted for. I therefore respectfully submit that her vote in favor of Mr. Stearley should have counted.

**THE VOTE OF MADELYN HASTINGS**

{47} It is undisputed that Ms. Hastings was a resident of Edgewood and registered to vote in the election. She had never missed a municipal election in Edgewood and her name was always on the signature roster. In this election, however, the poll workers told her she was not on the signature roster when she arrived to vote around 10:00 a.m. She explained that she should be on the roster, and it was noted that her husband was on the roster. She was told that the poll workers would need to call the Santa Fe County Clerk and verify her address "and get some sort of a verification of registration from them." The precinct judge knew her and that she lived in the town limits. He said he would call the county clerk and verify her address, that she should be on the list, and when he had done that, he would call her and she could return and vote. Ms. Hastings left and returned about forty-five minutes later to vote. At that time she was told she would need to fill out a "required challenge ballot." She did not know what such a ballot was, no one explained to her what it was, and no one said that the ballot was not going to be counted. She completed the "required challenge ballot" believing she was thereby voting and that her vote was going to be counted. She voted for Howard Calkins for mayor. If she had been told that her vote was not going to be counted, she would have remained at the polling place and requested that the poll workers continue calling the county clerk. "I would have insisted that the County Clerk do her job and verify my address."

{48} The precinct judge acknowledged he knew Ms. Hastings and that she lived in the Edgewood town limits. When she came to vote, her name was not on the voter roster, so he called the county clerk's office to see if she was eligible and he was told she was not on the roster. He told them, however, that he knew she lived inside the town of Edgewood. When Ms. Hastings returned, "We informed her of her right to vote. She had that right to vote. We told her she could not vote on the machine. There would be a written ballot that was available to her. She could vote. We would mark the ballot, put it in the box." Nevertheless, as the precinct judge, he did not know if her vote would be counted later. Later in the day it was discovered that other voters who also lived in the town limits were likewise not on the voter roster due to an error in the county clerk's office. In fact, the county clerk had left a whole subdivision off the roster. Accordingly, the county clerk started issuing certificates of eligibility to those voters. "But that option wasn't available for Ms. Hastings."

{49} Cheryl Huppertz also presented herself to vote but she was not on the voter roster, due to an error by the county clerk. Like Ms. Hastings, she was given a "required challenge ballot" to complete. Later in the election day Ms. Huppertz went to the town clerk's office to find out why her name had not appeared on the voter roster. The town clerk called the county clerk who acknowledged that Ms. Huppertz should have been on the roster. Accordingly, the county clerk issued her a certificate of eligibility. Ms. Huppertz' vote was not initially counted, but the canvassing board later decided to count her vote because she had been issued a certificate of eligibility, even though it was issued *after* she voted.

{50} The district court concluded, and the majority agrees, that Ms. Hastings' vote should not be counted because she did not receive a certificate of eligibility from the county clerk so her vote was not cast under Sections 3-8-40 and 3-8-40.1. They come to this conclusion even though her name was

improperly removed from the roster of voters by the county clerk, so she never should have been required to obtain one in the first place. Furthermore, she was entitled to receive a certificate of eligibility from the county clerk, but she was never given the opportunity to obtain one. They rely on Section 3–8–43(C), which states:

A required challenge shall be interposed by the precinct board when a person attempts to offer himself to vote and demands to vote and *his name does not appear on the signature roster and cannot be entered pursuant to Subsection C of Section 3–8–40.* ... A required challenge shall be interposed by the precinct board as follows:

(1) the election judge shall cause the election clerks to enter the person's name and address under the heading "name and address" in the signature roster in the first blank space immediately below the last name and address that appears in the signature roster;

(2) the election clerk shall immediately write the words "required challenge" above the space provided for the person's signature in the signature roster;

(3) the person shall sign his name in the signature roster;

(4) the person shall nevertheless be furnished a paper ballot, whether or not voting machines are being used at the polling place, and the election clerk shall write the number of the ballot so furnished next to the person's signature in the signature roster; and

(5) the person shall be allowed to mark and prepare the ballot. He shall return the paper ballot to an election judge who shall announce his name in an audible tone and in his presence place the required challenge ballot in an envelope marked "rejected-required challenge" that shall be sealed. The person's name shall be written on the envelope and the envelope containing *the rejected ballot shall then be deposited in the ballot box and shall not be counted.*

(Emphasis added.)

{51} Two observations demonstrate immediately why this statute does not prevent Ms. Hastings' vote from being counted. First, her name *could have* been entered on the signature roster under Section 3–8–40(C); the only reason it was not was because she was not provided the certificate of eligibility she was entitled to but not given. She could even have been provided the certificate *after* she voted, but she was not. Secondly, when the statute says that the "required challenge" ballot "shall not be counted," this only means that the municipal canvassing board cannot count the ballot in the canvass of returns under Section 3–8–53(C). Again, Section 3–8–64(A) does not say that the district court can only count "legal votes as described in Section 3–8–40 and 3–8–40.1," which provide for votes cast with a certificate of eligibility issued by the county clerk; it says the district court determines from the evidence the "legal votes ... proven to have been cast." I would conclude that Section 3–8–64(A) empowers the district court to count Ms. Hastings' vote because it is without question a "legal vote." In this regard, it can be questioned why the statute requires the ballot to be completed and sealed if it cannot be counted at any time, even by the district court under Section 3–8–64(A).

{52} A vote was cast by Ms. Hastings for Mr. Calkins and she was legally entitled to vote for him. Her vote was therefore a "legal vote" in that it was made by a "legal voter." Since she was mistakenly told to vote on a "required challenge ballot," a trial was necessary under Section 3–8–64(A). The trial without contradiction demonstrated that Ms. Hastings was entitled to vote, that she voted, and who she voted for. I therefore respectfully submit that her vote in favor of Mr. Calkins should have counted.

**CONCLUSION**

{53} I agree with the majority that Mr. Calkins properly contested the election and that a the Municipal Election Code permitted him to file the action challenging the election in district court without challenge prior to or during the election.

{54} However, I dissent from the majority opinion holding that the votes cast by Ms. Brown and Ms. Hastings should not be counted. I realize that this also results in a

814

tie vote, but this is not a reason not to count each and every vote because the directive that "every vote counts" is most significant in a closely contested election. It has been reported that more than three million votes were never counted in the 2004 presidential election and that a significant portion (1,389,-231) were not counted because they were deemed "spoiled" ballots. Among the reasons given were because the "x" was too light or the voter didn't punch the card hard enough, so the voter "hung the chad." Greg Palast, *Recipe for a Cooked Election*, Yes Magazine, Fall 2006. It was also reported that millions of Americans were panicked about computer voting machines leading up to that election. *Id.* The legislature has provided our courts with the necessary authority in Section 3–8–64(A) to assure our citizens that *all* "legal votes" that are "proven to have been cast" will be counted and not rejected for technical, trivial reasons and to diminish fears and suspicions that may exist about voting on computer voting machines.

{55} Finally, the facts of this case do not demonstrate "a more compelling consideration" not to count these two votes as required by our Supreme Court in *Valdez*. Since the majority concludes otherwise, I respectfully dissent.