IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2009-NMSC-003

Filing Date: February 9, 2009

Docket No. 31,386

STATE OF NEW MEXICO ex rel.
LEAGUE OF WOMEN VOTERS
OF NEW MEXICO,

      Petitioner,

v.

THE HONORABLE MARY HERRERA,
in her official capacity as SECRETARY OF
STATE OF NEW MEXICO,

      Respondent.

ORIGINAL PROCEEDINGS ON MANDAMUS

Edward Ricco, Esq.
Jocelyn Drennan, Esq.
Rodey, Dickason, Sloan, Akin
& Robb, P.A.
Albuquerque, NM

for Petitioner

Gary K. King, Attorney General
Scott Fuqua, Assistant Attorney General
New Mexico Attorney General's Office
Santa Fe, NM

for Respondent

## OPINION

**BOSSON, Justice.**

{1}    In this case, we confront a fundamental question about the basic unit of our representative democracy, the individual vote:  What constitutes a valid expression of voter

1

intent? The Legislature has already answered this question, at least in part, by providing that a hand-tallied vote shall be counted if "the presiding judge and election judges for the precinct unanimously agree that the voter's intent is clearly discernable [sic]." NMSA 1978, § 1-9-4.2(B) (2003, as amended through 2007).

{2}     We hold that this provision of the Election Code, as supported by certain guidelines and instructions promulgated by the New Mexico Secretary of State ("the Secretary"), is consistent with the U.S. Supreme Court's equal protection analysis in *Bush v. Gore*, 531 U.S. 98 (2000) (per curiam), to the limited extent that that opinion has bearing here, as well as the federal Help America Vote Act ("HAVA") of 2002 , 42 U.S.C. §§ 15301-15545 (2005). We therefore have granted the League of Women Voters of New Mexico's ("the League") emergency petition for writ of mandamus, and have ordered the Secretary to carry out the intent of our Legislature by fully conforming to and enforcing Section 1-9-4.2(B).  We granted the writ prior to issuing this opinion, which elaborates on that initial order.

**BACKGROUND**

{3}     On October 23, 2008, eleven days before the November 4 general election, the League filed with this Court an emergency petition for writ of mandamus.  The petition urged us to issue the writ to Secretary of State Mary Herrera, ordering her to enforce Section 1-9-4.2(B), which defines what types of votes on hand-tallied paper ballots shall be counted. The statute provides that four general categories of marks on a ballot shall be counted as valid votes:

> For paper ballots that are hand-tallied, a vote shall be counted if:
> (1) the ballot is marked in accordance with the instructions for that ballot type;
> (2) the preferred candidates' name or answer to a ballot question is circled;
> (3) there is a cross or check within the voting response areas for the preferred candidate or answer to the ballot question; or
> (4) the presiding judge and election judges for the precinct unanimously agree that the voter's intent is clearly discernable [sic].

Section 1-9-4.2(B).

{4}     At issue in this case is the "voter's intent" language of  Subsection (B)(4). The League claims that by ignoring and refusing to enforce Subsection (B)(4), the Secretary threatened widespread disenfranchisement of New Mexico voters. Without Subsection (B)(4), the statute would allow for only three types of voter marks to be counted as a valid vote, aside from marks made in accordance with ballot instructions:  a check, a cross or a circle.  Subsection (B)(4) appears to be a catch-all provision which allows other types of marks to be counted, so long as the presiding judge and election judges "unanimously agree"

2

that the voter's intent is "clearly discernable [sic]." Section 1-9-4.2(B).

**{5}** The Secretary appears to have decided not to enforce Subsection (B)(4) because of an advisory letter from the Attorney General, which concluded that Subsection (B)(4) is unconstitutional. That letter issued on May 16, 2008. In a belated response to the letter, the Secretary on September 30, 2008 promulgated an emergency amendment to1.10.12.15(C) NMAC, a rule which provides guidance to absentee precinct boards about how to read ballot markings. The new rule advised that ballots not marked in accordance with instructions would be counted "only if the voter has marked a cross (X) or a check (✓) within the voting response area, circled the name of the candidate or both." 1.10.12.15(C) NMAC (9/30/2008). By excluding any additional consideration of voter intent, this rule effectively eliminated Subsection (B)(4) from Section 1-9-4.2. It also contradicted the Secretary's earlier guidelines, Instruction 2008-10, which provided specific rules as to when votes should be counted.[1]

**{6}** The Attorney General's letter on which the Secretary relied concluded that Subsection (B)(4) is "inconsistent with HAVA and vulnerable to challenge on constitutional equal protection grounds." The letter asserted that the standard established by Subsection (B)(4) for determining voter intent "is virtually indistinguishable" from the Florida standard famously criticized in *Bush v. Gore*. The Florida Supreme Court had initially ordered the counties undertaking manual vote recounts in the 2000 presidential election to consider the "intent of the voter." *Bush v. Gore*, 531 U.S. at 102. The U.S. Supreme Court reversed the Florida Supreme Court and rejected the "intent of the voter" standard as arbitrary and violative of equal protection principles. *Id.* at 103. Accordingly, the Secretary asserted to this Court that she had a constitutional duty *not* to apply Subsection (B)(4).

**{7}** On October 28, immediately following expedited oral argument, we issued the writ requested by the League. We ordered the Secretary to comply with Subsection (B)(4). This opinion follows.

**DISCUSSION**

**{8}** We begin by reiterating the longstanding and fundamental principle that the right to vote is of paramount importance. *See Calkins v. Stearley*, 2006-NMCA-153, ¶ 30, 140 N.M. 802, 149 P.3d 118; *State ex rel. Read v. Crist*, 25 N.M. 175, 199, 179 P. 629, 637 (1919). The courts of New Mexico have long held that in service of this important right, courts should guard against voter disenfranchisement whenever possible and interpret statutes broadly to favor the right to vote. *See, e.g.*, *Darr v. Vill. of Tularosa*, 1998-NMCA-104, ¶ 18, 125 N.M. 394, 962 P.2d 640; *State ex rel. Walker v. Bridges*, 27 N.M. 169, 174, 199 P. 370, 372 (1921). New Mexico courts have also held that the right to vote can be

---

[1]Our use of the word "guidelines" in this opinion refers to the Secretary's Instruction 2008-10, and not the emergency rule amendment 1.10.12(C) NMAC.

subject to reasonable constraints consistent with the statutes governing voting. *See Calkins*, 2006-NMCA-153, ¶ 30. This Court may not interpret statutes unreasonably in order to facilitate voting. *Id.*

**{9}** We therefore confront two interests which may at times be opposed to one another. On one hand is the interest in effectuating a voter's intent. This is a very powerful interest indeed, for if a government fails to accurately identify and record a voter's choice, it has failed to carry out the fundamental transaction which sustains our representative democracy. On the other hand is the interest in ensuring that marks on a ballot are interpreted consistently for every voter. This too is a powerful interest. If officials read marks on a ballot one way in one part of the state and another way in another part of the state, the government has treated voters unequally for an arbitrary reason, namely geography. That would be unacceptable under equal protection principles.

**{10}** Both HAVA and *Bush v. Gore* aimed to focus more sharply the discretion of election officials in divining voter intent, or at least to standardize the methods by which officials may determine that intent. The question before us is whether Subsection (B)(4), in concert with regulations promulgated by the Secretary, hews to the principles set forth by *Bush v. Gore* and HAVA. Before addressing that question, we detour briefly to consider the propriety, under New Mexico law, of mandamus in this case.

**MANDAMUS**

**{11}** We first consider the League's standing to bring an action in mandamus, and whether mandamus is an appropriate remedy. This Court in its discretion may grant private parties standing to vindicate the public interest in cases presenting "issues of great public importance." *State ex rel. Sego v. Kirkpatrick*, 86 N.M. 359, 363, 524 P.2d 975, 979 (1974). Determining the validity of individual votes is of unquestionable importance. Establishing clear rules, prior to election day, as to how such validity is to be established is of equal, if not greater, importance. Therefore, there can be little doubt that construing the statute governing the counting of hand-tallied ballots qualifies under the "great public importance" standard of the *Sego* line of cases.

**{12}** The New Mexico Constitution gives this Court the power to issue writs of mandamus "against all state officers." N.M. Const. art. VI, § 3. Mandamus is appropriate to compel state officers to perform a statutory duty. *State ex rel. Clark v. Johnson*, 120 N.M. 562, 569, 904 P.2d 11, 18 (1995). Here, the Secretary is clearly a "state officer" within the meaning of the Constitution, and it is clear that the Secretary must follow the Election Code, and does not have the power to change its mandatory provisions. *Weldon v. Sanders*, 99 N.M. 160, 164-65, 655 P.2d 1004, 1008-09 (1982).

**{13}** This dispute is before us because the Secretary claims she has a duty not to enforce Subsection (B)(4) because of a perceived conflict with federal law. For reasons that follow, we disagree. We conclude that the Secretary has a clear mandatory duty to enforce Subsection (B)(4) as written and as amplified by the Secretary's own guidelines.

4

Accordingly, mandamus is an appropriate remedy.

**SUBSECTION (B)(4)**

**{14}** The Secretary argues that *Bush v. Gore* "directly addressed" the issue in the present case, and that a "straightforward application" of the language of HAVA "compels the same conclusion as that compelled by *Bush* – [Subsection (B)(4)] lacks sufficient uniformity to comply with HAVA."

**{15}** We are not persuaded that *Bush v. Gore* compels the Secretary to ignore New Mexico statutory law. Already limited by its own terms to the facts before that Court, *Bush v. Gore* is of even more limited relevance here. Furthermore, Subsection (B)(4), when combined with the specific guidelines the Secretary had originally implemented, provides sufficient statewide uniformity to comply with both *Bush v. Gore* and the plain language of HAVA.

**{16}** The Supreme Court in *Bush v. Gore* concluded that the recount process ordered by the Florida Supreme Court in the 2000 presidential election lacked sufficiently uniform rules for determining how a vote was to be counted. 531 U.S. at 105-06. It held that the Florida Supreme Court's order that local election officials were to discern the "intent of the voter," without anything more specific, violated equal protection principles. *Id.* The Court noted that the "problem inheres in the absence of specific standards to ensure . . . equal application" of the "intent" standard throughout the state. *Id.* at 106. The Court further observed that its consideration was "limited to the present circumstances, for the problem of equal protection in election processes generally presents many complexities." *Id.* at 109.

**{17}** In part because of the opinion's unusual self-limiting phrase, the precedential weight of *Bush v. Gore* is ambiguous, but the case nevertheless appears to have continuing life. *See, e.g.*, Chad Flanders, Comment, *Bush v. Gore and the Uses of "Limiting,"* 116 Yale L.J. 1159, 1167 (2007) (asserting that the *Bush v. Gore* Court's limiting language is "historically unique," and observing that the "practical issue of whether lower courts must follow *Bush v. Gore* . . . seems unlikely to disappear any time soon"); Richard L. Hasen, *The Untimely Death of Bush v. Gore*, 60 Stan. L. Rev 1, 3 (2007) (noting that no U.S. Supreme Court opinion, concurrence, or dissent has ever cited to the case, and declaring that "*Bush v. Gore* is dead"); Adam Liptak, *Bush v. Gore Set to Outlast its Beneficiary*, N.Y. Times, Dec. 23, 2008, at A1 (asserting that the opinion is "turning out to have lasting value after all"). Our research shows that some courts have found the decision applicable to challenges of voting systems, *see, e.g.*, *League of Women Voters v. Brunner*, 548 F.3d 463, 477 (6th Cir. 2008); *Black v. McGuffage*, 209 F. Supp. 2d 889, 898 (N.D. Ill. 2002); *Common Cause S. Christian Leadership Conference of Greater L.A. v. Jones*, 213 F. Supp. 2d 1106, 1108 (C.D. Cal. 2001). Courts have also applied the decision to challenges of recount procedures and standards for determining voter intent. *See, e.g.*, *Big Spring v. Jore*, 109 P.3d 219 (Mont. 2005). It seems, then, that some courts have treated *Bush v. Gore* as having some precedential weight, despite the opinion's warning that it applied only to the facts before that Court.

5

**{18}** In the case before this Court, however, *Bush v. Gore*'s relevance is limited. In addition to the self-limiting nature of the case, it is not applicable here because the Court addressed a situation far from analogous to our own. The Florida Supreme Court had ordered that local officials find the "intent of the voter," but provided no guidelines for doing so, *Bush v. Gore*, 531 U.S. at 106, while the Secretary's guidelines in New Mexico provide clear context and guidance for local election officials. The *Bush v. Gore* court noted that there was no requirement in Florida that the election judges come to a unanimous agreement as to what constituted voter intent, while New Mexico law specifically requires unanimity among election judges in determining voter intent. Section 1-9-4.2(B)(4). The Supreme Court noted that counties in Florida were using different standards for determining "intent of the voter," and at least one county even changed standards in the middle of the recount process. *Bush v. Gore*, 531 U.S. at 106-07. Here, all counties in New Mexico are subject to one uniform standard.

**{19}** It is true, as the Attorney General observed in his letter to the Secretary and as the Secretary argued to this Court, that under Subsection (B)(4) and the Secretary's guidelines, a theoretical possibility remains that election officials in different parts of the state could interpret the same ballot marking differently. However, we presume that the Secretary will obey the law in implementing the statute and the regulations, and that she will make a forceful effort to achieve uniformity in interpreting ballots. Furthermore, as we discuss below, there must be some room for discretion by local officials in order to guard against disenfranchisement. The hypothetical possibility that future violations *may* occur is an insufficient basis for striking down Subsection (B)(4) now. That statute achieves an appropriate balance between ensuring against disenfranchisement and promoting uniformity in the interpretation of hand-written ballots. Of course, we remain open to persuasion in any future case that might present concrete examples of arbitrary and discriminatory application of Subsection(B)(4) and the Secretary's guidelines.

**{20}** The Secretary's guidelines, styled Instruction 2008-10, were attached to the Secretary's August 22, 2008 memo to county clerks, titled "Absentee and Provisional Ballots, What Constitutes a Vote?" Instruction 2008-10 lays out detailed guidelines for determining what kinds of ballot marks should, and should not, constitute a legal vote, along with 30 graphical examples of ballots with unconventional markings, accompanied by rules about how to interpret such marks. For example, the instructions specify that a ballot on which the voter filled in the optical-scan ovals for more than one candidate for a single office shall not be counted. The graphical display shows three candidates, George Washington, Abraham Lincoln, and John Adams, with ovals to the left of their names. Two of the ovals, those for Lincoln and Adams, are filled in. The third remains empty. Beneath this graphical demonstration are the clear words, in boldface type: "Invalid vote." In another example ballot, the voter has darkened the oval next to John Adams' name, and has left the Lincoln and Washington ovals blank. However, the voter has handwritten "Yes" over Washington's name. Beneath this sample is the instruction: "Valid Vote for Adams." There are numerous such examples, all with clear instructions as to whether election judges should count such marks.

**{21}** Of course, it would be impossible for the Secretary's guidelines to account for every imaginable expression of voter intent. Human beings are unpredictable; sometimes it takes another human, rather than a machine or mechanically applied guidelines, to interpret human markings. An overly mechanical or formulaic approach might lead to unnecessary disenfranchisement of voters who mark their ballot in ways not accounted for in official guidelines, but which nonetheless, to the human eye, would appear as clear expressions of voter intent.

**{22}** At the same time, the discretion given to election judges must have clear limits—such is the mandate of HAVA and *Bush v. Gore*. Subsection (B)(4), along with the Secretary's guidelines as articulated in Instruction 2008-10, strike an appropriate balance. In concert, the two allow for some discretion by local election judges, but limit that discretion with clear and uniform guidelines. The August 22 memo and Instruction 2008-10, with its detailed rules and examples, are the kind of uniform standards that the U.S. Supreme Court found lacking in *Bush v. Gore*.

**THE HELP AMERICA VOTE ACT OF 2002**

**{23}** HAVA supports our conclusion. Congress passed the legislation in the wake of *Bush v. Gore*. The portion of the statute that applies here requires that states adopt "uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote." 42 U.S.C. § 15481(a)(6).

**{24}** We are unable to find case law, state or federal, specifically interpreting the portion of HAVA at issue in this case, and the parties in this case cited none. *Dolan v. Powers*, 260 S.W.3d 376, 380 (Mo. Ct. App. 2008), comes the closest to interpreting the HAVA provision at issue here, but that court does not go so far as to actually construe the statute, but rather merely mentions the law as background in interpreting a Missouri statute, quite similar to our own Section 1-9-4.2(B), regarding the proper determination of voter intent.

**{25}** Applying plain-language definitions to the operative HAVA terms, "uniform and nondiscriminatory," and reading these words in concert with HAVA and *Bush v. Gore*, it is clear that HAVA requires some basic level of consistency in the way election officials interpret whether a particular type of ballot marking is a valid expression of voter intent.[2] In HAVA's preamble, the legislation's purpose is set forth as establishing "*minimum* election administration standards for States and units of local government with responsibility for the administration of Federal elections." HAVA, Pub. L. No. 107-252, 116 Stat. 1666,

---

[2]Black's Law Dictionary defines "uniform" as "characterized by a lack of variation; identical or consistent." *Black's Law Dictionary* 1564 (8th ed. 2004). Black's second definition for "discrimination" is most fitting here: "a failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored." *Id*. at 500.

7

1666 (2002) (emphasis added).  Section 15484 restates this notion, noting that HAVA's requirements are "minimum requirements and nothing in [42 U.S.C. §§ 15301-15545] shall be construed to prevent a State from establishing election technology and administration requirements that are more strict than the requirements established under [42 U.S.C. §§ 15301-15545] so long as such State requirements are not inconsistent with the Federal requirements under [42 U.S.C. §§ 15301-15545]." 42 U.S.C. § 15484.  Making this idea even more explicit, and applying it generally to the entire statute is the following Section: "The specific choices on the methods of complying with the requirements of [42 U.S.C. §§ 15301-15545] shall be left to the discretion of the State." 42 U.S.C. § 15485.  HAVA, then, is a floor beneath which the states are not permitted to go.  Further, the statute's plain language is clear that states retain wide latitude, above that floor, in carrying out the statute's basic requirements.

{26}   HAVA's legislative history further supports the notion that Congress did not intend to strip states of their traditional role in supervising and carrying out elections.  Rather, the statute's main supporters, Democrats and Republicans alike, made explicit that state officials were to retain considerable discretion in carrying out HAVA's basic requirements.  Senator Chris Dodd, a Democrat and the principal author in the Senate of the conference report, asserted in floor debate for the conference report that:  "nothing in this bill establishes a Federal definition of when a voter is registered *or how a vote is counted*." 148 Cong. Rec. S10488, S10488 (statement of Sen. Dodd) (emphasis added).  Senator Dodd reiterated this idea multiple times, elsewhere asserting that "what constitutes a valid vote is left up to the States.  We don't federalize registration and we don't federalize how votes get counted. We have left that to the States . . . States ought to have the flexibility of deciding what system works best for them." 148 Cong. Rec. S10412, S10421.  Across the aisle and in the House of Representatives, Rep. Bob Ney, a chief House  sponsor of HAVA, similarly asserted in floor debate for the conference report that "[t]his legislation will pose certain basic requirements that all jurisdictions will have to meet, but they will retain the flexibility to meet the requirements in the most effective manner."  148 Cong. Rec. H7836, H7838.

{27}   Given HAVA's lack of any definition of what constitutes a vote within the meaning of 42 U.S.C. § 15481(a)(6), along with the clear intent of Congress to leave considerable discretion to the states to define for themselves what constitutes a legal vote, it appears that the most HAVA requires is uniform statewide standards as to what a legal vote shall be.  In other words, states are required to have certain minimum standards that are consistent geographically, as well as in terms of traditional bases for discrimination:  race, gender, and the like.  For reasons already discussed, Subsection (B)(4), in concert with the guidelines originally promulgated by the Secretary, provides sufficient assurances that county clerks in various parts of the state will interpret "voter's intent" in a uniform and nondiscriminatory fashion.  It is a clear, statewide standard, and therefore meets the requirements of HAVA.

{28}   We draw support from the statutes of our sister states, many of which are similar to our own.  A plurality of states appears to use a "voter intent" standard, and many of them apply such a standard with language strikingly similar, though not identical, to our own.

8

Some states use a clear voter-intent standard, while others state it in the negative: ballots where voter intent *cannot* be determined do *not* count. Statutes using the voter-intent standard, stated either in the positive or the negative, include: Ariz. Rev. Stat. Ann. § 16-645(A) (2006) ("When canvassing write-in votes the apparent intent of the voter shall be taken into consideration to the extent possible."); Conn. Gen. Stat. § 9-150(j) (2007) ("In the counting of absentee ballots the intent of the voter shall govern, [so long as three conclusive presumptions apply]."); Idaho Code Ann. § 34-1203 (2008) ("Any ballot or part of a ballot from which it is impossible to determine the elector's choice, shall be void and shall not be counted."); Ind. Code Ann. § 3-12-1-1 (2002) (subject to various exceptions, "the primary factor to be considered in determining a voter's choice on a ballot is the intent of the voter"); Me. Rev. Stat. Ann. tit. 21-A, § 696(4) (2004-05) ("If a voter marks the voter's ballot in a manner that differs from the instructions at the top of the ballot but in such a manner that it is possible to determine the voter's choice, then the vote for the office or question concerned must be counted."); Mo. Rev. Stat. § 115.453(3) (2007) ("The judges shall count votes marked substantially in accordance with this section and section 115.456 when the intent of the voter seems clear."); Mont. Code Ann. § 13-15-206(4)(a)(ii) (2007) ("If a majority of the counting board members agree that under the rules the voter's intent can be clearly determined, the vote is valid and must be counted according to the voter's intent"); Utah Code Ann. 1953 § 20A-4-105(6)(a) (2007) ("In counting the ballots, the counters shall give full consideration to the intent of the voter.").

**{29}** Although the wording of these statutes varies, sometimes greatly, all of them have in common a key concept: voter intent is the polestar by which officials are to judge the validity of ballots, and election judges have some discretion in determining what constitutes a valid expression of voter intent. New Mexico's statute has the same goals, though its wording is more spartan than many other statutes. It is evident from the statute's history that our Legislature specifically added the voter-intent wording to the legislation in 2007. The 2003 version of the statute held that "only a cross (X) or a check (☑) within the voting response area shall be counted." Section 1-9-4.2(B) (2003). Our Legislature in 2007 amended the statute to include the words that are at issue in this case. Subsection (B)(4) provides that a voter's mark shall be counted if "the presiding judge and election judges for the precinct unanimously agree that the voter's intent is clearly discernable [sic]." Section 1-9-4.2(B)(4). It is clear that by adding entirely new voter-intent language to the statute, our Legislature intended to delegate discretion to the Secretary to implement regulations for determining what constitutes "voter intent," and to diminish the chances for voter disenfranchisement by broadening the universe of valid ballot markings.

**{30}** We find no suggestion in the case law that any of the statutes of our sister states have been overturned on equal protection grounds. That said, there appears to be little case law interpreting these statutes, and none that we are able to find interpreting them in light of *Bush v. Gore* and HAVA.

**{31}** In this absence of interpretive material, the Attorney General appears to have understood federal law to bar virtually *any* statute which has as its goal determining "voter

9

intent."[3]  For the reasons set forth, we disagree.

**CONCLUSION**

**{32}**    Section 1-9-4.2, including Subsection (B)(4), as implemented by the Secretary's Instruction 2008-10, is constitutional on its face.  We therefore have ordered the Secretary to enforce Subsection (B)(4) as written and as interpreted by the Secretary's guidelines.

**{33}    IT IS SO ORDERED.**


_____
**RICHARD C. BOSSON, Justice**


**WE CONCUR:**


_____
**EDWARD L. CHÁVEZ, Chief Justice**


_____
**PATRICIO M. SERNA, Justice**


_____
**PETRA JIMENEZ MAES, Justice**


_____
**CHARLES W. DANIELS, Justice**


**Topic Index for** *State ex. rel League of Women Voters v. Herrera,* **No. 31,386**

| | |
|---|---|
| **AE** | **Appeal and Error** |
| AE-MD | Mandate |
| | |
| **CR** | **Civil Rights** |
| CR-VR | Voting Rights |

---

[3]The Attorney General's broad reading of *Bush v. Gore*, it must be noted, would likely invalidate all of the above-cited statutes from our sister states, because they all seek to discern the "intent of the voter," a standard which the Attorney General appears to have concluded is *per se* unconstitutional.

**CT**        **Constitutional Law**
CT-ED      Equal Protection
CT-RV      Right to Vote

**FL**        **Federal Law**
FL-FL       Federal Laws, General

**GV**       **Government**
GV-EL      Elections

**ST**        **Statutes**
ST-IP       Interpretation
ST-CN      Constitutionality