[No. 42647-8-I.   Division One.   August 30, 1999.]

THE STATE OF WASHINGTON, *Respondent*, v. MARK W. DENTON, *Appellant*.

*Nancy Talner, Kristin King-Ries*, and *Eric Broman* of *Nielsen, Broman & Associates, P.L.L.C.*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Henry James Corscadden* and *Charles Patrick Sainsbury, Deputies*, for respondent.

BECKER, J. — Mark Denton invoked the spousal privilege to prevent his wife from testifying against him. The trial court allowed her to testify, after finding the marriage invalid for lack of a marriage license. The ruling was in error. In Washington, failure to procure a license does not invalidate a ceremonial marriage. Denton's conviction for theft is reversed.

In 1986, Denton was active in the Bellevue Jaycees, a nonprofit community service organization whose members were involved in various charitable fund-raising projects. Denton set up and operated a Fourth of July fireworks stand to raise money for the Washington State Sudden Infant Death Syndrome (SIDS) Foundation. With three other officers of the Jaycees, he opened a bank account in Redmond in the name of Eastside Parents for SIDS.

In 1989, the Bellevue Jaycees disbanded. No one closed the Eastside Parents for SIDS bank account. Denton continued to receive monthly statements. Bank records show the account remained inactive for seven years with a balance of over $2,000. In 1996, Denton withdrew the funds and used them for his own purposes.

His transaction came to the attention of the police through Jill Bowersox, an acquaintance of Denton's who became suspicious in the course of helping him withdraw the funds. According to the testimony Bowersox gave at Denton's trial, Denton told her in January 1996 he needed to close out an old account that had less than $100 remaining in it. He explained that the money belonged to the Bellevue Jaycees and he was going to send it to the SIDS Foundation. Denton told Bowersox that he needed her help to close the account because he could not locate the former officers whose names were on the bank's signature card for the account. Although Bowersox had no affiliation with the Jaycees or the SIDS Foundation, she agreed to assist Den-

ton by adding her signature to the new card. The new card already bore the signatures of Denton, his 15-year-old daughter, and his wife.

It took four days for the bank to process the new signature card. According to the bank's policy, two of four signers were needed to authorize banking transactions. When four days had passed, Bowersox went to the bank with Denton to authorize the closing of the account. She testified that after they signed a withdrawal slip, she saw a bank teller hand Denton a cashier's check for "almost $3,000." Bank records show that Denton deposited a check for $2,610.38 into his own bank account.

Two of the original Jaycee signators on the account testified that the account was set up for charitable purposes, not for anyone's personal use. The State's theory was that Denton knew the money was not his but decided to convert the account to his own use when he encountered personal financial difficulty.

Before trial, Denton attempted to invoke the spousal testimonial privilege to prevent his wife, Leona Rosser, from testifying. The State argued that the Denton-Rosser marriage, though solemnized in a church wedding ceremony, was invalid because the couple did not procure a marriage license. The trial court agreed, and allowed Rosser to testify.

Rosser, separated from Denton at the time of trial, testified that during the early years of their marriage, bank statements arrived at their home addressed to the Bellevue Jaycees. She said Denton told her he was going to send the money from the account to the State Jaycee organization. She also testified that in January or February 1996, she herself loaned Denton $2,000 to help him out with business debts.

The jury convicted Denton as charged, and he appeals.

Denton maintains his marriage to Rosser was valid and that the court erred in refusing to honor his exercise of the spousal privilege.

■ Washington's spousal privilege is provided by statute, in part:

A husband shall not be examined for or against his wife, without the consent of the wife, nor a wife for or against her husband without the consent of the husband; nor can either during marriage or afterward, be without the consent of the other, examined as to any communication made by one to the other during marriage.

RCW 5.60.060(1). The statute affording the spousal privilege contemplates legal marital status. "[I]t applies only when there is a valid, existing marriage, and it applies even if such a marriage is in name only." *State v. Cohen*, 19 Wn. App. 600, 608, 576 P.2d 933, *review denied*, 90 Wn.2d 1022 (1978).

■ Denton and Rosser not only lived together and held themselves out as husband and wife for years, they formally began their marriage relationship with a religious ceremony in which they promised to take each other to be husband and wife. The question is whether their ceremonial marriage was valid notwithstanding the lack of a license.

This question is not new to Washington courts. In 1909, the Supreme Court reversed an order annulling a marriage between two teenagers who had obtained a marriage license through fraud. *In re Hollopeter*, 52 Wash. 41, 100 P. 159 (1909). In affirming the marriage as valid, the Court relied on the common law principle that a marriage without a license is universally held to be valid in the absence of an express declaration by the Legislature that such a marriage is void. *Id.* at 45; *see Weatherall v. Weatherall*, 63 Wash. 526, 529, 115 P. 1078 (1911) (absence of license or failure to properly file a license would not invalidate a marriage otherwise valid.)

The rule stated in *Hollopeter* remains the rule today. In the eyes of the common law, marriage is a civil contract. As BLACKSTONE put it, the law treats marriage "as it does all other contracts: allowing it to be good and valid in all cases, where the parties at the time of making it were, in the first

place, *willing* to contract; secondly, *able* to contract; and, lastly, actually *did* contract, in the proper forms and solemnities required by law." *Picarella v. Picarella*, 20 Md. App. 499, 316 A.2d 826, 832, n.10 (1974) (quoting 1 WILLIAM BLACKSTONE, COMMENTARIES, ch. 15, § 433 (Lewis's ed.)). (Emphasis added.)

The policy favoring valid marriages is strong. It justifies recognition of an unlicensed ceremony unless the licensing statute plainly makes an unlicensed marriage invalid. *See, e.g., Carabetta v. Carabetta*, 182 Conn. 344, 438 A.2d 109, 112-113 (1980). New Jersey's statute is an example of an express declaration making a marriage license necessary for a valid marriage; it provides that "no marriage . . . shall be valid unless the contracting parties shall have obtained a marriage license." N.J. STAT. ANN. § 37:1-10 (West). Where such a statute exists, even a ceremonial marriage is invalid without a license. *See Nelson v. Marshall*, 869 S.W.2d 132 (Mo. Ct. App. 1993); *Moran v. Moran*, 188 Ariz. 139, 933 P.2d 1207 (1996). But where there is no such statute, a marriage license is not integral to the creation of a valid marriage. *See Feehley v. Feehley*, 129 Md. 565, 99 A. 663 (1916).

■ Washington has a statutory requirement for a marriage license. "Before any persons can be joined in marriage, they shall procure a license from a county auditor." RCW 26.04.140. But Washington does not have a statute plainly making an unlicensed marriage invalid. Therefore, the purpose of the license requirement is purely regulatory. The regulatory purpose cannot be enforced by "the radical process of rendering void and immoral a matrimonial union otherwise validly contracted and solemnized." *Feehley*, 99 A. at 665. Intentional failure to procure a license is punishable as a misdemeanor, RCW 26.04.200, but it does not render a marriage void or even voidable. *See* RCW 26.04.130 (marriage voidable when party is unable to consent, or where consent obtained by force or fraud).

The spousal privilege, although strictly construed, *State v. Sanders*, 66 Wn. App. 878, 883, 833 P.2d 452 (1992),

*review denied*, 120 Wn.2d 1027 (1993), does apply when there is a valid, existing marriage. *State v. Cohen*, 19 Wn. App. at 608. Because Denton and Rosser were parties willing and able to contract for marriage, and did contract for it in the solemnities required by law, their marriage was valid. We are aware of no authority for declaring a marriage to be valid for some purposes but not for others. The court erred in allowing Rosser to testify without Denton's consent.

■ Error in the admission of evidence does not warrant a reversal unless the error materially effected the outcome of the trial. *State v. Cunningham*, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980). Here, we find that it did. Without the testimony of Rosser, the jury may have accepted Denton's defense of good faith claim of title. Larry Henning, who assisted Denton in establishing the fireworks stand, and Gary Bykonen, one of the original Jaycee signers on the bank account, both testified that they believed the proceeds from the fireworks stand belonged to Denton, not to the Jaycees. Henning and Denton testified that the Bellevue Jaycees were involved with the stand only to assist in staffing it, and that Denton had no obligation to donate any of the proceeds to the Jaycees or the SIDS Foundation. Denton denied telling anyone that he intended to donate the money to the SIDS foundation. He also denied concealing facts about the ownership of the account from the three new signators.

Rosser's testimony, on the other hand, tended to prove that Denton always considered himself obligated to remit the money remaining in the account to the State Jaycees. Her testimony also helped to prove that Denton needed the money to pay off debts. Permitting Rosser to testify was not harmless error. Denton is entitled to a new trial.

Denton also assigns error to the admission of evidence of his financial difficulties at the time he withdrew the funds. The court admitted the evidence as relevant to his motive and intent. Because we remand for a new trial based on the error in failing to apply the spousal privilege, we do not

rule on this issue. On remand, Rosser's testimony about Denton's business debts will not be available. The trial court will need to determine the relevance and probative value of the remaining evidence of Denton's alleged financial motive.

We need not decide whether the court properly denied Denton's mistrial motion. The motion was based on a prejudicial remark the State elicited from Bowersox on direct examination. Care should be taken upon retrial to prevent the remark from being repeated.

Reversed.

KENNEDY, C.J., and APPELWICK, J., concur.