**Certiorari Denied, October 13, 2010, Docket No. 32,601**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2010-NMCA-106**

**Filing Date: August 13, 2010**

**Docket No. 29,511**

**HEIDI CAROLINE BARTON RIVERA,**

      **Petitioner-Appellee,**

**v.**

**JAIME RIVERA,**

      **Respondent-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
**J. Richard Brown, District Judge**

Max Houston Proctor
Hobbs, NM

for Appellee

Reagan & Sanchez, P.A.
Mark Terrence Sanchez
Hobbs, NM

for Appellant

**OPINION**

**FRY, Chief Judge.**

**{1}**    This appeal stems from divorce proceedings initiated in 2008 by Wife, Heidi Rivera, against Husband, Jaime Rivera. Prior to trial, Wife filed a motion to dismiss the case for lack of jurisdiction, arguing that the marriage was void due to the fact that the parties were married in New Mexico but had only a Texas marriage license. The district court agreed and dismissed the divorce proceedings. Prior to the dismissal, Husband had sought to invalidate a premarital agreement he signed shortly before the wedding on the ground that the

1

agreement was unconscionable due to the terms of the agreement and his inability to understand what he was agreeing to. In its dismissal order, the district court noted that if the marriage had been valid, the court would have ruled that the premarital agreement was valid and enforceable. Husband appeals the district court's dismissal of the divorce proceedings and its conclusion that the premarital agreement was enforceable. For the following reasons, we reverse the judgment of the district court.

**BACKGROUND**

{**2**}    Husband and Wife met while Wife was on vacation in Mexico where Husband resided. A romantic relationship ensued, and Husband and Wife dated for over a year. The parties decided to get married, and Husband moved to the United States to marry Wife. A few days prior to the wedding, Husband and Wife went to Wife's attorney's office in Hobbs, New Mexico, to sign a prenuptial agreement that Wife had asked her attorney to prepare. According to Husband, he was under the impression that the agreement was a formality required for the marriage, and he did not understand English well enough to know exactly what he was signing. The district court's uncontested findings, however, indicate that Husband declined an offer to have the document interpreted.

{**3**}    On February 14, 2000, Husband and Wife were married during a ceremony before the Reverend Jothen Kinney in Hobbs. Prior to the ceremony, the parties had obtained a marriage license from the Gaines County clerk's office in Seminole, Texas, which is located approximately thirty miles from Hobbs. The marriage license issued to the parties granted "authoriz[ation] to solemnize the rites of matrimony between Mr. Jaime Armando Rivera and Miss Heidi Caroline Barton" to "any person authorized by the laws of the state of Texas to celebrate the rites of matrimony in the state of Texas." The parties took this license to Rev. Kinney, who was authorized to perform marriage ceremonies in both New Mexico and Texas, and who performed the marriage ceremony and filled out the information required on the license. Under the "county of marriage" section, "Lea" was written in, "Texas" was crossed out, and "New Mexico" was written in its place. The license was then returned to the Gaines County clerk, who accepted the returned license and recorded it in the county records on March 17, 2000.

{**4**}    Following the marriage, the couple resided in Hobbs and had two children. In April 2008, after eight years of marriage, Wife filed a petition for dissolution of marriage, citing incompatibility between herself and Husband. In November 2008, despite having filed numerous pleadings presuming the validity of the marriage, Wife filed a motion to dismiss her petition, arguing that the district court lacked jurisdiction. Wife contended that her petition was premised on her belief that the parties were lawfully married in the State of New Mexico when in fact the parties were not lawfully married in New Mexico. Wife argued that she and Husband had failed to obtain a marriage license and medical certificate as required by New Mexico law and that their marriage was therefore invalid. Wife noted that while she had obtained and recorded a marriage license in Texas, she had not met Texas' statutory requirements for a valid marriage because she did not have a ceremony in Texas. Wife also contended that the ceremony in New Mexico was invalid because the pastor who officiated had no authority to perform the marriage ceremony in New Mexico without a valid New Mexico marriage license.

**{5}** The district court agreed with Wife and found that it did not have jurisdiction over the parties' divorce. Specifically, the court found that "the parties celebrated a marriage ceremony in the State of New Mexico that was never authorized by the laws of New Mexico" and that the marriage was therefore invalid. The court concluded that "the laws of Texas are irrelevant to any decision necessary to a resolution of th[e] matter." The court explained that New Mexico law requires couples desiring to marry to obtain a license in New Mexico and present the license to the person officiating at the ceremony and that without a valid license, the marriage ceremony has no legal effect. Based on this conclusion, the district court dismissed the divorce action. Because Husband had also contested the validity of the premarital agreement, the court concluded that "[i]f the marriage had been valid, the prenuptial agreement would have likewise been valid and enforceable." Husband appeals the district court's dismissal of the divorce proceedings and its conclusion that the premarital agreement was valid.

## DISCUSSION

### Standard of Review

**{6}** The facts in this case are generally undisputed. At issue is whether a marriage performed in New Mexico without a New Mexico license is valid. Because this involves a question of law, we review the district court's conclusions of law de novo. *Jacob v. Spurlin*, 1999-NMCA-049, ¶ 7, 127 N.M. 127, 978 P.2d 334.

### Choice of Law

**{7}** Because the marriage was celebrated in New Mexico but licensed in Texas, we briefly address the conflict-of-law issue that this case appears to present. According to Texas law, the "validity of a marriage is generally determined by the law of the place where it is celebrated." *Husband v. Pierce*, 800 S.W.2d 661, 663 (Tex. App. 1990). New Mexico, like Texas, "applies the rule of comity, that the law of the place of contract governs the validity of a marriage." *In re Bivians' Estate*, 98 N.M. 722, 726, 652 P.2d 744, 748 (Ct. App. 1982). Because the place of the marriage ceremony is the place of the contract, *see Restatement (First) of Conflict of Laws* § 121 comment c (1934) (explaining that "[t]he contract of marriage comprises any form of mutual consent from a formal ceremony to a mere exchange of written or oral promises, which may be required by the law of the place where the ceremony takes place"), and because the marriage ceremony was performed in New Mexico, New Mexico law governs the validity of Husband's and Wife's marriage whether we look at Texas' or New Mexico's choice-of-law laws. We thus address whether the marriage was valid under New Mexico's substantive law.

### The Marriage Was Valid Even Though No New Mexico License Was Obtained

**{8}** Our Supreme Court has stated that "[f]or a marriage to be valid, it must be formally entered into by contract and solemnized before an appropriate official." *Merrill v. Davis*, 100 N.M. 552, 553, 673 P.2d 1285, 1286 (1983). The purpose of the requirements that a marriage be formal and solemnized are based on our State's rejection of common law marriage and

3

the need to avoid "the possibility of fraud arising from claims of common [] law marriage." *Id.* (internal quotation marks and citation omitted). Because New Mexico does not recognize common law marriage, something more than mere cohabitation and reputation as husband and wife is required to create a valid marriage in this state. *See In re Bivians' Estate*, 98 N.M. at 726, 652 P.2d at 748.

**{9}** Thus, our case law requires that for a New Mexico marriage to be valid, it must be solemnized before an appropriate official and be formally entered into by contract. While this Court has noted on a number of occasions that "[m]arriage is a civil contract requiring a license," *see, e.g.*, *State v. Lard*, 86 N.M. 71, 74, 519 P.2d 307, 310 (Ct. App. 1974) (internal quotation marks omitted), and *In re Bivians' Estate*, 98 N.M. at 726, 652 P.2d at 748, and that a marriage "is also a contract in which the public is interested and to which the state is a party," *id.*, we have never directly addressed the issue of whether a couple who has a marriage ceremony but fails to obtain a New Mexico license has a valid marriage.

**{10}** NMSA 1978, Section 40-1-10 (1973) provides that "[e]ach couple desiring to marry in New Mexico shall obtain a license from a county clerk and file the same for recording in the county issuing the license, following the marriage ceremony." In addition to the requirement that the couple desiring to be married obtain a license, NMSA 1978, Section 40-1-14 (1905), provides that "[a]ll persons authorized to solemnize marriage shall require the parties contemplating marriage to produce a license signed and sealed by the county clerk authorizing said marriage." After the completion of the marriage ceremony, the "person[] performing the marriage ceremony" has "the duty . . . to certify said marriage to the county clerk within ninety days from the date of marriage." NMSA 1978, § 40-1-15 (1905).

**{11}** In the event that the person authorized to solemnize the marriage "neglect[s] or fail[s] to comply with the provisions" requiring the parties to produce a license or fails to certify the marriage, he or she "shall be deemed guilty of a misdemeanor." NMSA 1978, § 40-1-19 (1905). In addition, a person who "willfully violate[s] the law by deceiving or attempting to deceive or mislead any officer or person authorized to perform the marriage ceremony in order to obtain a marriage license or to be married, contrary to law," is also guilty of a misdemeanor. *Id.*

**{12}** Based on the text of NMSA 1978, Sections 40-1-1 to -20 (1859-1860, as amended through 2001), it is clear that a license from a New Mexico county clerk is required in order for a couple to be married within this state. The question before us, however, is whether the parties' marriage in this case was valid even though their marriage ceremony was performed in a New Mexico county but the license was obtained in another state. Other courts considering this question have hinged the validity of an unlicensed marriage on whether the licensing aspect of the statute is viewed as mandatory or directory. If the statute is directory, then an unlicensed marriage is valid. *See, e.g.*, *De Potty v. De Potty*, 295 S.W.2d 330, 330-31 (Ark. 1956). If the statute is mandatory, then any marriage performed without a license is automatically void. *See, e.g.*, *Moran v. Moran*, 933 P.2d 1207, 1211-12 (Ariz. Ct. App. 1996).

**{13}**   In *De Potty*, the Arkansas Supreme Court was confronted with a question identical to the one before us today—"whether residents of [Arkansas] may legally contract marriage in [Arkansas] with a license issued by a foreign state." 295 S.W.2d at 330 (internal quotation marks omitted).  The parties in *De Potty* lived in Texarkana, Arkansas, which apparently borders Texas to such an extent that a portion of the city is in Texas. *Id.* The parties obtained a Texas marriage license on the Texas side of Texarkana, but they were married by a duly ordained minister on the Arkansas side of the city. *Id.* In determining that its licensing statute was directory and that an Arkansas marriage performed without an Arkansas license was therefore not void, the court noted that generally "a statutory provision for a license to marry shall not be regarded as mandatory, and vital to the validity of a marriage, in the absence of a clear indication of a legislative purpose that it should be so construed." *Id.* at 331 (internal quotation marks and citation omitted).

**{14}**   The Connecticut Supreme Court made a similar holding in a case where it addressed whether a ceremonial marriage performed by an authorized person but without a license was void. *See Carabetta v. Carabetta*, 438 A.2d 109, 110 (Conn. 1980).  In concluding that such a marriage was not void, the court noted that "[i]n the absence of express language in the governing statute declaring a marriage void for failure to observe a statutory requirement . . . such a marriage, though imperfect, is dissoluble rather than void." *Id.* at 112.  More recently, the Washington Court of Appeals determined that because "Washington does not have a statute plainly making an unlicensed marriage invalid[,] . . . the purpose of the license requirement is purely regulatory." *State v. Denton*, 983 P.2d 693, 696 (Wash. Ct. App. 1999).  The court explained that "[t]he regulatory purpose cannot be enforced by the radical process of rendering void and immoral a matrimonial union otherwise validly contracted and solemnized" and that an "[i]ntentional failure to procure a license is punishable as a misdemeanor, but it does not render a marriage void or even voidable." *Id.* (internal quotation marks and citations omitted); *see also Boysen v. Boysen*, 23 N.E.2d 231, 234 (Ill. App. Ct. 1939) (noting that an unlicensed marriage is not void unless the legislature expressly declares it so); *McPeek v. McCardle*, 888 N.E.2d 171, 174-75 (Ind. 2008) (noting that under Ohio law, a marriage performed without a license would likely be valid because there is no directive that an unlicensed marriage is automatically void).

**{15}**   Jurisdictions holding that marriage ceremonies performed without a license are invalid typically base their decisions on the fact that the statutory licensing scheme expressly states that a marriage performed without a license is invalid or void.  In Arizona, for example, a license is mandatory and, therefore, any marriage performed without one is invalid because Arizona's licensure statute provides that "[a] marriage contracted [in Arizona] is not valid unless . . . [a] license is issued." *Moran*, 933 P.2d at 1211 (quoting Ariz. Rev. Stat. Ann. § 25-111(B)[(1) (1999)]).  In holding that this language made an unlicensed ceremony invalid, the court explained that the express language invalidating the marriage indicated that the statute is mandatory, not directory. *Id.* at 1211-12.  Other jurisdictions interpreting their marriage licensing statutes as mandatory base their holdings on similar express language that voids or invalidates marriages performed without a license. *See, e.g.*, *Nelson v. Marshall*, 869 S.W.2d 132, 134 (Mo. Ct. App. 1993) (explaining that a statute which provided that "no marriage hereafter contracted shall be recognized as valid unless the license has been previously obtained" was mandatory and made any unlicensed

5

marriage void (emphasis omitted) (internal quotation marks and citation omitted)). Thus, the general consensus among jurisdictions is that in the absence of express statutory language invalidating an unlicensed marriage, ceremonial marriages performed without a license are valid. *But see Beverlin v. Beverlin*, 3 S.E. 36, 39-40 (W. Va. 1887) (holding that language implying that an unlicensed marriage is invalid is sufficient). We agree with the view expressed by the majority of jurisdictions considering the question that in order for an unlicensed marriage to be invalid, the licensure statute must expressly state that an unlicensed marriage is invalid.

{16}   Here, while the district court determined that the marriage of the parties in this case was void and therefore "not recognizable in the State of New Mexico," there is no express statement in Sections 40-1-1 to -20 that our Legislature intended that marriages properly solemnized in New Mexico were void based on the absence of a New Mexico license alone. In fact, the only type of marriages our Legislature has expressly declared to be void are incestuous marriages and marriages between or with infants under the age of majority. *See* §§ 40-1-5, -7, -9. Because our Legislature has demonstrated the ability to expressly make certain types of marriages void and because our Legislature has declined to do so in the case of marriages performed without a New Mexico license, we conclude that our Legislature did not intend to make such marriages void.

{17}   We also note that although Section 40-1-20 could be viewed as implying that an unlicensed marriage is void, we are not persuaded that it does. That statute provides that

> [a]ll marriages celebrated or contracted in the territory of New Mexico, during the year A.D. 1905, without the persons entering into the marriage relation, having first obtained a license . . . but which marriages were valid according to the law as it existed prior to April 13, 1905, are hereby validated and legalized and shall have the same force and effect as if . . . the parties contracting such marriage had first obtained a license to marry from the probate clerk of the county wherein such marriage occurred.

*Id. But see Beverlin*, 3 S.E. at 39-40 (holding that similar language in a marriage license statute created the inference that marriages conducted without a license are void). We conclude that this section serves merely to clarify the status of those individuals who were married during the first year that licenses were required in this state, 1905. We follow the reasoning of those states requiring express statutory language "plainly making an unlicensed marriage invalid" before holding an unlicensed ceremonial marriage invalid. *See, e.g.*, *Denton*, 983 P.2d at 696. Because there is no express language in Sections 40-1-1 to -20 invalidating a marriage performed without a license, we conclude that our marriage licensure statute is merely directory, that ceremonial marriages performed without a license are valid, and that the district court erred in dismissing the case for lack of jurisdiction.

{18}   We are mindful that the case before us is limited to the question of whether a marriage can be deemed valid when a marriage ceremony is performed but the parties fail to obtain a New Mexico license. This was not an attempt to circumvent the laws of this state by engaging in a marriage that would otherwise be contrary to New Mexico's statutory

scheme that prohibits incestuous marriages and marriages between or with minors without parental consent. Neither party disputes that they intended to be married in February 2000. They obtained a marriage license from a county clerk, they participated in a marriage ceremony before an ordained and authorized minister, and they recorded their marriage license with the same county clerk's office from which they obtained the license. The couple lived together as husband and wife and had children together. Wife changed her last name to reflect her marriage to Husband, and the parties filed joint tax returns for the eight years that they were married. In addition, Wife filed two petitions for dissolution of marriage in which she stated her understanding and belief that she and Husband were validly married. Perhaps due only to the proximity of the marital residence to Seminole, Texas, where the Gaines County clerk's office is located, the parties obtained their marriage license from and filed it with a Texas county clerk and not a New Mexico county clerk. However, this is not a case where one of parties denies that a marriage ever took place, nor is there evidence that the marriage was somehow contrary to New Mexico's statutory prohibition against incestuous marriages and marriages between or with minors without parental consent.

**{19}**    We emphasize that our decision today does not in any way render the marriage license meaningless. Marriage licenses continue to be required under New Mexico law as evidence that a marriage fully complies with all requirements of the law. The parties in this case applied for the issuance of a marriage license although they did so in another state. They held a valid ceremony and intended to enter into a contract of marriage. We conclude that given the facts in this case, the couple met the legal requirements of a marriage in this state despite their failure to obtain a New Mexico marriage license. *See Merrill*, 100 N.M. at 553, 673 P.2d at 1286 (explaining that "[f]or a marriage to be valid, it must be formally entered into by contract and solemnized before an appropriate official"). We also note that our decision today has no effect on our state's prohibition of common law marriages. Common law marriages and marriages in which no ceremony is performed and no contract is entered into continue to be unlawful in this state.

**The Premarital Agreement Executed by the Parties Is Unconscionable**

**{20}**    Because we conclude that the marriage between Husband and Wife was valid, we also address whether the district court erred in determining that the prenuptial agreement signed by Husband is valid and enforceable. The district court concluded that "[i]f the marriage had been valid, the prenuptial agreement would have likewise been valid and enforceable." On appeal, Husband argues that the prenuptial agreement he signed is unenforceable because he was told that it was just a formality, he did not understand the content of the agreement, and the terms of the agreement are unconscionable.

**{21}**    We have not previously considered the applicable standard of review when reviewing a district court's conclusion that a premarital agreement is valid. The Uniform Premarital Agreement Act, NMSA 1978, §§ 40-3A-1 to -10 (1995), provides that the "issue of unconscionability or voluntariness of a premarital agreement shall be decided by the court as a matter of law." Section 40-3A-7(B). Because the issue is decided as a matter of law, our review is de novo. *See Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 27, 147 N.M.

7

583, 227 P.3d 73 (noting that "[w]e review these questions of law de novo, without deference to the district court's legal conclusions" (internal quotation marks and citation omitted)). Underlying this question of law are factual determinations regarding the circumstances surrounding the execution of the agreement. We review the district court's findings regarding these circumstances for substantial evidence. *Calkins v. Stearley*, 2006-NMCA-153, ¶ 2, 140 N.M. 802, 149 P.3d 118.

**{22}** The Uniform Premarital Agreement Act provides in part that

[a] premarital agreement is not enforceable if the party against whom enforcement is sought proves that:

(1)     that party did not execute the agreement voluntarily; or

(2)     the agreement was unconscionable when it was executed and, before execution of the agreement, that party:

(a)     was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

(b)     did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

(c)     did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

Section 40-3A-7(A). We conclude that Subsection (2) is dispositive.

**{23}** With respect to the requirements listed as (a), (b), and (c) above, Wife does not dispute Husband's assertion that she did not disclose the extent of her assets prior to the execution of the agreement, and there is no evidence that Husband either waived his right to disclosure of Wife's property or that he had or could have had an adequate knowledge of her property and financial obligations. *See* § 40-3A-7(A)(2). Thus, the sole issue before us is whether the agreement was unconscionable.

**{24}** Husband argues that the agreement was unconscionable because (1) it conflicts with New Mexico's public policy, and (2) he had a limited understanding of the English language at the time he executed the agreement and he "had been given to understand that the premarital agreement was a formality associated with marriage." Unconscionability has "two prongs: substantive unconscionability and procedural unconscionability." *Fiser v. Dell Computer Corp.*, 2008-NMSC-046, ¶ 20, 144 N.M. 464, 188 P.3d 1215. "Substantive unconscionability relates to the content of the contract terms and whether they are illegal, contrary to public policy, or grossly unfair," while "[p]rocedural unconscionability is

8

determined by analyzing the circumstances surrounding the contract's formation, such as whether it was an adhesive contract and the relative bargaining power of the parties." *Id.*

**{25}**   Husband contends that the premarital agreement is substantively unconscionable because it "affects . . . the right to seek spousal support after divorce or separation," in violation of Section 40-3A-4(B). Wife makes no response to this argument and contends only that "[t]here is no evidence in the record, whatsoever, that the [premarital a]greement was unconscionable." Section 40-3A-4(B) provides that "[a] premarital agreement may not adversely affect the right of a child or spouse to support." In violation of this requirement, the agreement provides that Husband and Wife "waive any right to be supported by the other from the other's property, including but not by way of limitation, any claim for support, maintenance, medical expenses or otherwise, after the death, divorce or permanent separation of the parties." The paragraphs of the agreement in which the parties agree that their separate property will remain separate also provide that the parties "shall have no claim for support, maintenance or claim, of any kind." Because these provisions of the premarital agreement adversely affect the right of the spouses to support, the agreement is contrary to the public policy expressed in Section 40-3A-4(B) and is therefore unconscionable. *See Fiser*, 2008-NMSC-046, ¶ 20.

**{26}**   While we conclude that the provisions of the agreement that violate Section 40-3A-4(B) are unconscionable, we must determine the effect the unconscionability of these provisions has on the agreement as a whole. The agreement does not contain a severability clause, and Wife makes no argument that the remainder of the agreement should not be affected by the invalidity of the support provisions. Because Wife makes no argument and because we are unable to discern whether the parties bargained for the waiver of spousal support in exchange for other benefits or concessions, we are unable to conclude that any portion of the agreement is valid without the unconscionable provisions. Thus, we conclude that the entire agreement is unconscionable and reverse the district court's conclusion that the agreement is valid and enforceable.

**CONCLUSION**

**{27}**   For the foregoing reasons, we reverse the judgment of the district court.

**{28}**   **IT IS SO ORDERED.**

_____
**CYNTHIA A. FRY, Chief Judge**

**WE CONCUR:**

_____
**JONATHAN B. SUTIN, Judge**

_____
**LINDA M. VANZI, Judge**

9

**Topic Index for *Rivera v. Rivera*, Docket No. 29,511**


**AE**            **APPEAL AND ERROR**
AE-SR       Standard of Review

**CP**            **CIVIL PROCEDURE**
CP-CL       Conflict of Laws
CP-MD      Motion to Dismiss

**CN**            **CONTRACTS**
CN-CO      Contracts Against Public Policy
CN-UC      Unconscionable

**DR**            **DOMESTIC RELATIONS**
DR-ML      Marriage License
DR-UP      Uniform Premarital Agreement Act
DR-VM     Validity of Marriage

**ST**            **STATUTES**
ST-LI       Legislative Intent